COMMUNITIES FOR EQUITY, et al., Plaintiffs,

v.

MICHIGAN HIGH SCHOOL ATHLETIC ASSOCIATION, Defendant.

No. 1:98CV479.

United States District Court, W.D. Michigan, Southern Division.

Dec. 17, 2001.

As Corrected Dec. 21, 2001.

---

H. Rhett Pinsky, Smith, Fayette & Hulswit, Grand Rapids, MI, Robin K. Bohnenstengel, Piper, Marbury, Rudnick & Wolfe, LLP, Baltimore, MD, Marcia D. Greenberger, Washington, DC, Kristen Galles, Alex-

andria, VA, Neena Chaudhry, Barbara A. Burr, Philip L. Cohan, Piper, Marbury, Rudnick & Wolfe, LLP, Washington, DC, for Plaintiffs.

Carole D. Bos, Bos & Glazier, William M. Azkoul, Azkoul & Azkoul, Grand Rapids, MI, Edmund J. Sikorski; Ann Arbor, MI, for Defendant.

Charles R. Gross, U.S. Attorney's Office, Grand Rapids, MI, Sarah A. Dunne, U.S. Department of Justice, Washington, DC, for Amicus.

## OPINION

ENSLEN, District Judge.

**"Change is the only constant. Hanging on is the only sin." -Denise McCluggage, U.S. race car driver, as quoted in _WomenSports_ magazine, June 1977, at 18.**

After a three and one-half year legal struggle, this case is finally ready for resolution. It began on June 26, 1998, when Plaintiffs, an organization named Communities for Equity and two mothers of female student-athletes suing on behalf of their minor daughters, filed a class action lawsuit alleging that the Michigan High School Athletic Association (MHSAA), MHSAA's executive director, and members of the MHSAA Representative Council[1] discriminated against female athletes.

Plaintiffs alleged that the discrimination against high school female athletes took a variety of forms, specifically naming seven areas of discrimination against female athletes. Once this case wound its way to

bench trial before the Court, only one area of alleged discrimination remained for the Court's decision. The sole remaining area of alleged discrimination is the allegation that Defendant MHSAA schedules athletic seasons and tournaments for six girls' sports during less advantageous times of the academic year than boys' athletic seasons and tournaments, and that this scheduling of girls' athletic seasons constitutes legally inequitable treatment.

The scheduling of the girls' sports at issue involves volleyball in the winter, basketball in the fall, soccer in the spring, Lower Peninsula golf in the spring, Lower Peninsula swimming and diving in the fall, and tennis in the fall.[2] Specifically, Plaintiffs claim that all of these girls' sports, with the exception of girls' golf, are played in a non-traditional season, i.e., a season of the year different from when the sport is typically played, and that the non-traditional season is a disadvantageous time of the year to play the sport, causing inequities for girls. Lower Peninsula girls' golf is played in golf's traditional season of spring, but Plaintiffs claim that in the case of golf in Michigan, the non-traditional season of fall is far superior to the spring season, and fall is when Lower Peninsula Michigan boys play golf.

Plaintiffs' federal claims arise under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983; and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 _et seq._, (Title IX).

---

1. MHSAA's executive director and members of the Representative Council have been referred to throughout the litigation as the "Individual Defendants." Plaintiffs' claims remain against only Defendant MHSAA, and not the Individual Defendants, who were dismissed from the lawsuit on a motion made pursuant to Fed.R.Civ.P. 52(c). (10/2/01 Order, Dkt. No. 507.)

2. In the Upper Peninsula of Michigan, boys' and girls' golf are both played in the spring, and boys' and girls' swimming and diving are both held in the winter, so only the Lower Peninsula scheduling of these two sports is at issue in this lawsuit.

Plaintiffs' state law claim arises under Michigan's Elliott–Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2101 *et. seq,* specifically those sections barring discrimination in schools and in public accommodations and services. The Court has jurisdiction over Plaintiffs' state law claim through its supplemental jurisdiction.

Plaintiffs seek declaratory and injunctive relief and attorneys' fees. In terms of injunctive relief, Plaintiffs ask that the District Court require that male and female teams of the same sport be scheduled to play in the same season and that girls' volleyball be scheduled to play in the fall. In the alternative, if the Court finds adequate justification for scheduling female and male seasons differently, Plaintiffs ask this Court to require Defendant MHSAA to schedule the same number of male and female sports in non-traditional seasons, "so as to allocate the benefits and burdens of playing in different seasons equally between females and males."

Defendant MHSAA argues that its placement of the girls' sports seasons at issue is advantageous for female athletes and thus not discriminatory. The MHSAA also asserts that legitimate reasons exist for scheduling some male and female teams of the same sports in different seasons, reasons which mostly encompass asserted logistical difficulties in putting more students in one season.

The United States was granted *amicus curiae* status to brief the Court and participate in the trial on the issues of federal law presented. (9/7/00 Order, Dkt. No. 255.) The United States argues in favor of Plaintiffs' position in this matter.

A bench trial over eight days was held to allow the Court to hear from witnesses and to receive documentary exhibits in order to determine what the facts are and what legal conclusions are to be drawn from those facts. During this time, the Court heard from twenty-five witnesses and received 103 exhibits.

Federal Rule of Civil Procedure 52 requires that in cases tried without a jury, the Court shall make findings of fact separately from its conclusions of law. Fed. R.Civ.P. 52(a). Findings of fact shall not be set aside unless clearly erroneous. *Id.*

Much has been said in this case about what a "traditional" season is and what a "non-traditional" season is. For most sports, it is common knowledge when tradition dictates that a sport will be played. Ask almost any woman or man on the street when organized football, on any level, is played, and that person is sure to know that football is a fall sport.

In this case, the Court cares about traditional sports seasons only to the extent that a traditional season, or the season when the sport is usually played at most levels, happens to be the most advantageous playing season for the high school sports at issue in this case. So if girls play sports in non-traditional seasons when boys play in traditional seasons, that does not necessarily break the law, if girls and boys are equally advantaged by the season in which they play a sport.

But a tradition does not become a tradition simply because of random coincidence. A particular playing season often becomes the traditional season for a particular sport in the first place because certain advantages accrue to playing a sport in a certain season. For example, there is a reason why outdoor organized sports like soccer, tennis and football are not played in the winter in Michigan. Similarly, there are other reasons, perhaps less obvious to the casual observer than Michigan weather, why certain sports are not generally played in certain seasons.

The question for this Court is not whether the process through which the

MHSAA came to the decisions that it has to schedule girls' sports where it does was fair. The question for this Court is also not whether this Court believes that the scheduling decisions of the MHSAA were wise. The question for this Court is whether the scheduling decisions made by the MHSAA are legally permissible, and the Court has come to the conclusion that they are not. The MHSAA's seasons decisions are not permitted under the Fourteenth Amendment to the United States Constitution, Title IX, or Michigan's Elliott–Larsen Civil Rights Act.

The Court finds in favor of Plaintiffs and will order appropriate remedies as described herein.

### FINDINGS OF FACT

### I. THE PARTIES

### A. Plaintiffs, Diane Madsen, Jay Roberts–Eveland, and Communities for Equity

Plaintiff Diane Madsen is a teacher for Kentwood Public Schools in the Grand Rapids area. (Trial Transcript [3] (Tr.) at 14:12–19, Diane Madsen Testimony.) Ms. Madsen filed suit on behalf of her three daughters, Katie, Kristi and Kelsey Madsen, who were all minors at the time the suit was filed. (Id. at 14:24–15:6; Stipulated (Stip.) Fact No. 28.) The Madsen daughters have participated in or are currently participating in high school sports at Grand Rapids Northview High School, a MHSAA member school. (Stip. Fact No. 15.) Katie, currently attending Aquinas College in Grand Rapids, played basketball and volleyball; Kristi, currently attending Cornerstone University, also in Grand Rapids, played softball, basketball, volleyball, tennis and was a member of the swim and dive team; and Kelsey, currently a

junior at Northview High School, plays basketball and volleyball. (Tr. at 15:7–16:2, D. Madsen; Tr. at 90:15–22, Kristi Madsen.)

Ms. Madsen is also president of Plaintiff Communities for Equity (CFE). (Tr. at 23:22–24:12, D. Madsen.) Ms. Madsen testified that she viewed a number of areas in her children's school's girls' sports programs as highly inequitable, compared to boys' sports programs, and she subsequently became interested in changing the situation. (See, e.g., id. at 16:7–19:7.) Ms. Madsen and other parents with similar concerns at other schools began to meet to discuss the issue, and CFE was formed. (Id. at 23:6–21.)

CFE was founded by parents and student-athletes in 1997 "to educate people about the compliance of Title IX, about gender equity in general in athletics, and to advocate for the compliance of Title IX." (Tr. at 23:3–28:25, D. Madsen.) CFE works toward this goal by distributing a "parental tool kit" for parents and students to learn about Title IX, and by speaking to groups throughout Michigan. (Id. at 25:14–20, 26:14–27:2; Trial Exhibit (Tr. Exh.) 51 (CFE Tool Kit: "A Parental Guide to Title IX and Gender Equity in High School Athletics").) In addition, CFE advocates its position with various parties, including the MHSAA, to whom CFE complained about the current scheduling of seasons for girls, including sending CFE's position papers and examples of harms that CFE feels result for girls under the status quo. (See Tr. Exhs. 57–59.)

Plaintiff Jay–Roberts Eveland has filed suit on behalf of her daughters, Kele and Breanna, who were both minors at the time this lawsuit was filed. (Tr. at 372:19–22, Kele Eveland Testimony; Tr. at

---

**3.** Citations are to the transcript prepared daily by the Court's Official Court Reporter

Kathleen S. Thomas for the parties during trial.

633:14–17, Breanna Eveland Testimony; Stip. Fact No. 30.) Ms. Eveland is also vice-president of CFE. (Tr. at 24:9–15, D. Madsen.) The Eveland daughters have participated or currently participate in high school sports at East Kentwood High School, a MHSAA member school. (Stip. Fact No. 15.) Kele, currently attending Georgia Tech University on an athletic scholarship for volleyball, played volleyball and basketball in high school. (Tr. at 374:17–21, K. Eveland.) Breanna, currently a senior at East Kentwood High School, plays basketball and volleyball and runs track. (Tr. at 634:15–23, B. Eveland.)

This lawsuit has been certified as a class action. Madsen, Eveland, and CFE represent a class of all present and future female students enrolled in MHSAA member schools participating in interscholastic athletics or deterred from participating because of Defendant MHSAA's allegedly discriminatory conduct, and who are adversely affected by that conduct. *Communities for Equity v. Michigan High Sch. Athletic Ass'n*, 192 F.R.D. 568, 570 (W.D.Mich.1999).

## B. Defendant Michigan High School Athletic Association

Defendant Michigan High School Athletic Association (MHSAA) acts as the governing body for interscholastic sports in the State of Michigan. The MHSAA is an incorporated membership organization. (Tr. Exh. 28 (MHSAA Articles of Incorporation).) Its Articles of Incorporation describe the MHSAA's purpose as follows:

> To create, establish and provide for, supervise and conduct interscholastic athletic programs throughout the state consistent with the educational values of the high school curriculums, the interest in physical welfare and fitness of the students participating therein by giving the opportunity to participate in athletics

designed to meet the needs and abilities of all and to make and adopt such rules and regulations and interpretation thereof to carry out the foregoing and to further provide for the training and registering of officials and to publish and distribute such information consistent therewith and to do any and all acts and services necessary to carry out the intent hereof.

(Tr. Exh. 28; Stip. Fact 1.)

The MHSAA membership is comprised of over 700 Michigan high schools, over 80 percent of which are public. (Tr. Exh. 9(a) at 13 (2000–01 MHSAA Handbook); MHSAA's Answers to Plaintiffs' First Request for Admissions, Response No. 5 (served 7/28/99).) Put another way, all of Michigan's public high schools with qualifying interscholastic athletic programs, with the exception of some charter schools, are MHSAA members. (*Compare* Tr. Exh. 12 (1999–00 MHSAA Member School Directory) *with* Tr. Exh. 26 (Michigan Department of Education's list of public high schools).) Nearly all of MHSAA's member schools are recipients of Federal financial assistance. (*Compare* Tr. Exh. 12 *with* Tr. Exh. 25 (Michigan Public School District Directory).)

The MHSAA was founded in 1924 "to exercise control over the interscholastic athletic activities of all schools of the state through agreement with the Superintendent of Public Instruction." (Tr. Exh. 116 at 3 (1978–79 MHSAA Handbook Foreword).) Historically, the interscholastic athletic programs of all Michigan public schools were supervised and controlled by either the Michigan Superintendent for Public Instruction or by the State Board of Education. *See* School Code of 1955, 1955 P.A. 269, § 784; Mich. Comp. Laws § 388.1014 (2001). The MHSAA was housed within the Michigan Department of Education, and its Executive Director was

known as the "State Director of Athletics." (Tr. Exhs.115, 117.) The MHSAA's handbook, rules, and regulations were part of the Administrative Code of the State of Michigan. (Tr. Exh. 118.)

In 1972, the Michigan Legislature amended the School Code to move the authority for interscholastic athletics from the State Board of Education to the boards of individual school districts, permitting the districts to join the MHSAA as long as a representative of the State was a member of the MHSAA's governing body. 1972 P.A. 2, § 379 (repealed 1976); Mich. Comp. Laws § 380.1289 (1976) (amended 1995). Also, the Michigan Legislature designated the MHSAA as the "official association of the state for the purpose of organizing and conducting athletic events, contests, and tournaments among schools and [decreed that it] shall be responsible for the adoption and enforcement of rules relating to eligibility of athletes in schools for participation in interschool athletic events, contests and tournaments." *Id.*

The MHSAA incorporated itself in 1972 "to create, establish and provide for, supervise and conduct interscholastic athletic programs throughout the state consistent with educational values of the high school curriculum." (Tr. Exh. 28 at 2 (Articles of Incorporation); Stip. Fact No. 1.) Membership in the MHSAA is open to all secondary schools in Michigan. (Tr. Exh. 9(a) at 15 (2000–01 MHSAA Handbook, Constitution, art. II, § 1).) To join the MHSAA, a school's board of education must agree to adopt MHSAA rules and regulations "as its own and agree[ ] to primary enforcement of such rules as to its own schools." (*Id.* at 15 (Constitution, art. II, § 2).) Membership may be denied or delayed to schools who engage in "practices and behaviors ... that are in opposition to [MHSAA's] regulations and princi-

ples for interscholastic athletics." (*Id.* at 14 ("How to Join the MHSAA").)

In 1995, the Michigan Legislature amended the School Code again, removing the MHSAA's official designation, but confirming that school districts were still authorized to "join organizations [such as the MHSAA] as part of performing the functions of the school district." Mich. Comp. Laws § 380.11a(4) (2001). The 1995 amendment resulted in no substantive changes in the structure or operation of the MHSAA or in its relationships with its member schools.

The MHSAA regulates interscholastic athletic competition between member schools and sets standards for school membership and eligibility of students to participate in interscholastic athletics. For example, the MHSAA has adopted playing rules and regulations for each MHSAA-sanctioned sport. (Tr. Exh. 9(a) at 50 (Regulation II, § 8).) These regulations "apply in sub-varsity, as well as varsity, interscholastic scrimmage as well as games, and regular season as well as MHSAA tournaments." (*Id.* at 26; Tr. Exh. 14 at 7 (1999–00 MHSAA Coaches Guidebook, p. 5) ("Schools shall adhere to the playing rules adopted by the MHSAA to govern games and meets in baseball, basketball, competitive cheer, cross country, football, golf, gymnastics, ice hockey, soccer, softball, skiing, swimming and diving, tennis, track and field, volleyball and wrestling.").) Further, the MHSAA must approve any meet or tournament held in Michigan involving three or more teams sponsored by a nonmember school, and if such an event is approved, it must be conducted pursuant to MHSAA rules. (Tr. Exh. 9(a) at 47–48 (Regulation II, § 5(A) and Interpretation No. 157).)

MHSAA rules state that any person coaching an interscholastic team "SHOULD be a member of the regular

teaching staff or the school district." (Tr. Exh. 9(a) at 46 (Regulation II, § 3) (capitalization in original).) Non-faculty member coaches must register with the MHSAA prior to assuming any coaching duties. (Id.; Tr. Exh. 21(f) (MHSAA Non–Faculty Coach Registration Form).)

In all MHSAA-sanctioned sports except tennis and golf, the MHSAA requires its member schools to use only MHSAA-registered game officials to officiate athletic contests in which teams from those schools participate. (Tr. Exh. 9(a) at 49 (Regulation II, § 7).) To register as an official, a person must complete an application form indicating which sports he or she will officiate, pass a written examination on MHSAA rules and regulations, and pay a registration fee to the MHSAA. (Tr. Exh. 20(a) (MHSAA memorandum to "Prospective MHSAA Officials"); Tr. Exh. 20(b) (MHSAA Officials Registration Application).)

The MHSAA limits participation in interscholastic athletics to "eligible" students. (Tr. Exh. 9(a) at 46 (Regulation II, § 1).) To be eligible to play, a student must, among other things, be younger than age 19, have passed at least four full credit courses during the previous semester, be currently passing four full credit courses, and have passed a physical examination. (See id. at 27–45 (Regulation I— "Essential Eligibility Requirements for Senior High School Students"); Tr. Exh. 18 (MHSAA pamphlet summarizing eligibility rules).)

Member schools who violate any of the MHSAA's rules are subject to a wide range of penalties, including censure, probation, bans from regular season competition and MHSAA tournaments, forfeiture, and expulsion. (Tr. Exh. 9(a) at 78 (Regulation V, § 4).) MHSAA has adopted a "due process procedure" for investigating alleged violations and assessing penalties, which includes adequate notice to the party being investigated, written findings, and the right of appeal. (Id. at 21–23 (Due Process Procedure).) MHSAA actively enforces its rules and regulations. (MHSAA's Answers to Plaintiffs' Second Request for Admissions, Response No. 37 (served 7/29/99).)

"[G]eneral control of interscholastic athletic policies" is vested in the Representative Council, according to the MHSAA's Constitution. (Tr. Exh. 9(a) at 18 (Constitution, art. VI, § 1).) The Council is composed of nineteen voting members, of which fourteen individuals are elected by member schools, four individuals are appointed by the Representative Council, and one is a representative of the state superintendent of education. (Id. at 15 (Constitution, art. IV, § 1).) Except for the state representative, membership in the Representative Council is limited to faculty and board of education members of each member school. (Tr. Exh. 9(a) at 16.) Council members must resign their positions if they end their position at member schools. (Tr. Exh. 9(a) at 13, 15–17.)

The fourteen elected members of the Representative Council are elected by vote of the member schools. (Tr. Exh. 9(a) at 13.) In 2000–01, seventeen of the nineteen members of the MHSAA Representative Council were employees or representatives of public schools or school districts. (See Tr. Exh. 9(a) at 6–7 compared with Tr. Exh. 25 (Michigan Public School District Directory).)

The MHSAA has an Executive Committee, comprised of five Representative Council members, three elected officers and two members appointed by the president. (Stip. Fact 6.) One of the Executive Committee's powers is to "[m]ake all rules necessary for the effective control and government of interschool activities consonant with the legislation enacted by the Repre-

sentative Council and with this Constitution. . . ." (Tr. Exh. 9(a) at 18.)

The Executive Director of the MHSAA is "the executive officer in control of Senior High School and Junior High/Middle School interscholastic athletics." (Tr. Exh. 9(a) at 19.) The Executive Director is also responsible for investigating, deciding, and penalizing violations of the MHSAA's rules and regulations. (*Id.*) Decisions of the Executive Director are "subject to review by the Executive Committee and/or the Representative Council, upon appeal by the Administration of the Member School or Schools involved." (*Id.*)

Most of the MHSAA's revenue is derived from state championship tournaments. Approximately 86 percent of the MHSAA's budget comes from the sale of tickets to its tournament events. (Tr. Exh. 16 at 2 (Flyer-"This is the MHSAA").) Member schools remit a substantial portion of the gate receipts from their participation in the state championship tournaments to the MHSAA. (*See* Tr. Exhs. 37(a)-(h) (MHSAA Financial Report Forms from MHSAA Tournaments).) For example, in 1997, Rockford High School hosted a regional football playoff which grossed $14,948 in admissions; $12,208 (82 percent) was remitted to the MHSAA. (Tr. Exh. 37(a).) The remainder of the MHSAA's revenue comes from tournament concessions, fees for the registration of officials, advertising in tournament programs, corporate sponsorship, and royalties from radio and television broadcasts of MHSAA tournament events. (Tr. Exhs.35–37.)

The MHSAA issues broadcast policies on radio and television coverage for both regular season and post-season tournaments. "The Representative Council . . . passed a regulation effective August 1, 1989, prohibiting live television originations of regular-season athletic events involving member schools." (Tr. Exh. 21(a) at 3.) MHSAA rules also state that "[n]o school may televise live—or may grant on a complimentary or fee basis to either a profit or nonprofit entity the rights to televise live on commercial, subscription or independent stations or networks—any interscholastic event in which any MHSAA member school is a participant in any MHSAA Tournament sport." (Tr. Exh. 9(a) at 59 (Regulation II, Section 14(B)).) Schools participating in broadcast events do not receive any portion of the broadcast royalties. (Tr. Ex. 20(a)). Finally, member schools host many of the tournament games and provide employees to manage those game sites. (*See* MHSAA's Answers to Plaintiffs' First Request for Admissions, Response No. 7 (served July 28, 1999).)

Until January 1, 1988, MHSAA employees with state teaching certificates were considered state employees eligible to participate in the state retirement system. Mich. Comp. Laws § 38.1347(1) (1987). Employees who began with the MHSAA before that date still have membership in the state employees' retirement system. Mich. Comp. Laws § 38.1347(1)-(2) (2001).

The Representative Council appoints committees which make recommendations to the Council on seasons and other issues, recommendations which are rejected or approved by the Council. (*Id.* at 944:13–945:1.) Further, as a condition of membership, schools are obligated to follow all of the MHSAA rules; put simply, "it's a take it or leave it proposition." (Tr. at 867:11–15, K. McGee.)

Many member schools belong to leagues or conferences which also regulate interscholastic athletics to some degree. (Tr. at 785:16–788:5, K. McGee.) But all conference rules must comply with MHSAA rules, since the schools are also MHSAA members. (*Id.* at 863:14–864:1; Tr. at 164:4–10, L. Kostreva; Tr. Exh. 222, at 2,

6–9.) The Big Nine Athletic Conference Constitution, for example, prescribes that "failure to join MHSAA will result in automatic exclusion from membership in the league." (Tr. Exh. 222 at 6 (Big Nine Athletic Conference Constitution).)

The MHSAA determines when seasons occur. The MHSAA prescribes when practice may begin, when competition may begin, when competition must end, and the maximum number of games that may be played. (Tr. Exh. 9(a) at 54–55 (Regulation II, § 11(A)).) Member schools are prohibited from practicing outside of the dates set by the MHSAA calendar. (Tr. Exh. 9(a), at 54–61, 109–110; Tr. Exhs. 63, 83.) Member schools may not participate in any competition beyond the end of the MHSAA season or state championship tournament in any sport. (Id. at 59 (Regulation II, § 12).) For example, for the 2000–01 school year, the MHSAA prohibited girls' basketball teams from practicing before the week of August 15, limited teams to 20 games and four scrimmages for the season, and required teams "to terminate practice and competition on or before the final date of the MHSAA sponsored ... tournament." (Tr. Exh. 9(a) at 54–55 (Regulation II, §§ 11(A), 11(B), and 12).)

Schools, with the assistance of conferences and leagues if they are a part of one, set only the practice schedule and game dates within a season. In addition, MHSAA rules prohibit member school athletes from participating in both interscholastic sports and amateur club sports in the same sport in the same season. (Tr. Exh. 14, at 4; Tr. Exh. 9(a) at 43–44.)

The MHSAA also limits the scope of permissible activities "outside of the MHSAA-defined season for a sport." (Tr. Exh. 9(a) at 55 (Regulation II, § 11(G)).) Sports activities during that time cannot use school transportation, school uniforms, or school district funds; hold mandatory practices or games; or involve more than three players from the same school team if the coach is also present. (Id.)

The MHSAA sponsors state championship tournaments in twelve boys' sports and twelve girls' sports. (Tr. Exh. 16 at 3 (Flyer—"This is the MHSAA").) These state-wide tournaments are open only to MHSAA member schools who comply with MHSAA's rules and regulations. (Stip. Fact No. 14; MHSAA's Answers to Plaintiffs' First Request for Admissions, Response No. 12 (served July 28, 1999); Tr. Exh. 9(a) at 76 (Regulation V).) "[O]nly those teams playing a sport during a current season will be eligible to enter the MHSAA meet or tournament in that sport. For example: Girls golf teams playing in the fall season will not be eligible to enter the Girls Regional Golf Tournament in the spring." (Tr. Exh. 9(a) at 60 (Regulation II, § 15, Interpretation No. 214).)

The very nature of interscholastic athletics necessitates a controlling entity like the MHSAA. (Tr. Exhs.22, 115.) The structure provided by the MHSAA as Michigan's governing body is necessary for appropriate organization of interscholastic athletics. "[I]t would be chaos" with "a system of high school sports where there is not a level playing field ... by when [schools] compete against each other." (Tr. at 869:8–14, Kathleen McGee Testimony; Tr. Exh. 22 at 3 (MHSAA document explaining that in contrast to non-athletic activities such as music and drama, central control and a "statewide regulatory body" is necessary to the success of interscholastic athletics).) Indeed, 90 percent of high schools in the state of Michigan and 60 percent of the junior high/middle schools are members of MHSAA. (Tr. Exh. 16 at 2.)

## II. THE SCHEDULING HISTORY OF GIRLS' SPORTS

John Roberts, the MHSAA's current executive director, has written, "Boys' sports were in [MHSAA member] schools first and girls' sports, which came later, were fitted around the pre-existing boys program. While this allowed for the best use of facilities, faculty and officials, it also led to an imbalance of girls' athletic opportunities across the three seasons of the school year." (Tr. Exh. 81 at 1 (John Roberts, "Sports and Their Seasons," 1990–91 MHSAA Bulletin).)

Until the early 1970s, before it was an MHSAA-sanctioned sport, girls played high school basketball in the winter at the same time boys' teams played. (Tr. at 576:1–15, 577:20–25, Catherine Dritsas[4] Testimony.) In December 1970, the MHSAA received requests from certain schools for permission to start girls' basketball practice "before the established winter starting dates," to run girls' basketball in fall. (Tr. Exh. 33 at 2 ("Girls Basketball in Michigan," Sept. 1983 MHSAA Bulletin).) The reasons given for the request included "better use of the physical plants." (*Id.;* Tr. at 578:1–8, C. Dritsas.) After a hearing held on October 11, 1971 to discuss the topic, it was recommended that a rule permitting competition in girls' basketball at any time during the school year be adopted. (Tr. Exh. 33 at 2.) There is no indication whether this rule was adopted. (*See id.*) Presumably the rule was adopted, however, since an unknown number of girls' teams may have also been playing in the fall at some point before the MHSAA sponsored a tournament for girls' basketball. (*Cf.* Tr. at 772:6–10, K. McGee.)

The MHSAA held the first MHSAA girls' basketball tournament in fall 1973. (Tr. Exh. 27 at 6 (1972–73 MHSAA Bulletin, vol. XLLX [sic], at 422).) Surveys were submitted to schools to determine when they wanted the tournament held. (Tr. Exh. 33 at 2.) In 1976, the MHSAA's Girls' Basketball Committee recommended that the "Girls Basketball season move to the Winter and Girls Volleyball be played in the fall." (Tr. Exh. 78 at 1 (Minutes of 5/22/76 Girls Basketball Committee Meeting).)

The following year, the MHSAA merged the Girls' Basketball Committee into a single committee of boys' and girls' basketball coaches. (Tr. Exh. 78 at 3 (Minutes of 5/5/77 Basketball Coaches Committee Meeting).) By a vote of 11–2, the newly-constituted Basketball Coaches Committee voted to keep boys' basketball in the winter and girls' basketball in the fall. (*Id.*)

Some schools attempted to continue playing girls' basketball in the winter. (Tr. at 580:5–14, C. Dritsas.) Within a couple of years, however, these schools had to move girls' basketball to the fall because they "didn't have anybody to compete against and the girls were denied the opportunity of any state tournament competition." (*Id.*)

The MHSAA noted in 1983, in "Girls Basketball in Michigan," that "[i]t is alleged that girls and boys are not treated equally because of the split seasons; but it is quite obvious, based on the surveys, that school administrators believe a split season in boys and girls basketball is the very best way to meet the needs of interscholastic athletic competition for both boys and girls." (Tr. Exh. 33 at 2.)

4. Ms. Dritsas coached girls' basketball at the Academy of Sacred Heart in the Detroit area from 1969 to 1997. (Tr. at 575:1–5, C. Dritsas.) She was inducted into the Michigan High School Coaches Hall of Fame in 1993. (*Id.* at 575:13–17.) She was called to testify by the United States.

Prior to 1971–72, the MHSAA scheduled boys' golf in the spring. The MHSAA moved the boys' season to the fall to obtain "the use of better courses on Saturdays." (Tr. Exh. 29 at 2 (1973–74 MHSAA Bulletin, vol. L, p. 5)). In 1976, the Representative Council decided to conduct the girls' tournament on Mondays instead of Saturdays "since Saturdays are days in which it is extremely difficult to acquire courses for participation." (Tr. Exh. 10(b) at 3 (1976 MHSAA Bulletin, at 6).) The following year, the Sports Season Committee reconsidered recommending to the Representative Council that it switch girls' golf from the spring to the fall, but the vote was defeated within the committee by a narrow margin. (Tr. Exh. 87 (5/4/77 Sports Season Committee Meeting Minutes at 16).)

In 1981, the Representative Council decided to schedule boys' and girls' soccer together in the fall, "based on the survey of schools, as well as the financial advantage to schools in conducting the sport during the same season for boys and girls." (Tr. Exh. 47 at 3 (Minutes of 12/9/81 Representative Council Meeting at 393).) In fact, sixty member schools voted for separate seasons for the sexes in soccer, but eighteen schools voted for a combined season. (Tr. Exh. 229 (1981 Survey—Soccer).) However, most schools (507) expressed no preference, and many apparently did not vote. (Id.) After being asked by several school administrators to reconsider its decision, the Representative Council "determined that, beginning with the 1982–83 school year, a Boys Soccer Tournament would be scheduled in the fall and a Girls Soccer Tournament would be scheduled for the spring." (Tr. Exh. 10(d) at 5 (Minutes of 3/28/82 Representative Council Meeting).)

In May 1990, the MHSAA recognized that girls' participation opportunities in the winter season were lacking. "[G]irls' ath-letic opportunities in the winter are in almost every Michigan high school, inadequate compared to boys' opportunities in the winter and girls' opportunities in the fall and spring." (Tr. Exh. 81 at 1 (John Roberts, "Sports and Their Seasons," 1990–91 MHSAA Bulletin).) Consequently, the MHSAA took the "first step" to remedy this inequity "by changing Lower Peninsula girls swimming and diving from the fall season to the winter." (Id.) Thirteen years earlier, in 1977, the MHSAA's Sports Season Committee had recommended to the Representative Council that it "change the girls swimming season to coincide with the boys season in the winter." (Tr. Exh. 87 at 1 (5/4/77 Sports Season Committee Minutes).)

In November 1990, the MHSAA reversed the decision to move girls' swimming and diving to the winter and decided to study, among other things, "the most opportune placement of the girls and boys swimming seasons in the Lower Peninsula" and "the most opportune placement of other sports currently regulated by MHSAA (volleyball, basketball and golf for girls and soccer for boys are frequently discussed)." (Tr. Exh. 81 at 1 (John Roberts, "Sports and Their Seasons," 1990–91 MHSAA Bulletin).) This reversal was due to opposition, at least in part, by fifty schools and the Michigan Interscholastic Swim Coaches Association (MISCA). (Tr. Exh. 45 at 236; Tr. at 1196:2–24, Greg Phill Testimony.)

Following its reversal, the Representative Council "reaffirmed the need to continue discussing sports seasons." (Tr. Exh. 95 at 9–11 (4/23/91 Memorandum Regarding "Pro–Active Approach to Expanding Athletic Opportunities for Girls in the Winter Season").) This discussion led to a proposal that the MHSAA move "slowly and deliberately to examine the placement of several existing programs" while at the

same time considering whether to sponsor new winter activities for girls. (*Id.*)

The MHSAA was aware that it could be held legally liable if girls' sports seasons were found legally inequitable. The proposal to study seasons was "made mostly to do what is needed for girls, but also in part to keep the MHSAA in a position of choosing its future voluntarily rather than being forced to fight legislated or court-ordered changes in the future if something is not done soon." (Tr. Exh. 95 at 9.)

Of the three winter activities that it considered, bowling, indoor track and competitive cheerleading, MHSAA decided to adopt cheerleading for girls in 1994. (Tr. Exh. 95 at 10; Tr. Exh. 9(a) at 26; Tr. Exh. 98.) [5] With respect to moving existing seasons, the Representative Council was informed by the author of an MHSAA document that "it is important for the long term that the MHSAA conduct without fanfare a comprehensive study of sports seasons," including (1) "switching girls and boys Lower Peninsula swimming seasons by the year 2000;" (2) "combining boys and girls golf into a single coed program by the year 2000 (and possibly doing the same for tennis);" and (3) "switching girls volleyball and basketball seasons by the year 2000." (Tr. Exh. 95 at 11.)

That memo, of April 23, 1991, also "proposed that the Representative Council give the directive to the MHSAA staff in May *to work quietly but steadily through the state's athletic and educational communities for however long is necessary to find and/or forge consensus regarding these and other ideas.*" (*Id.* (unclear whether

emphasis in original).) There is no evidence that the MHSAA studied the sports season issue as recommended, and MHSAA has implemented none of the proposed changes detailed above.

Finally, the MHSAA does not currently sponsor boys' volleyball. But the MHSAA's executive staff and volleyball committee have recommended that once the sport is adopted, it be played in the spring when the NCAA schedules men's volleyball. (Tr. Exh. 79 at 2 (Excerpts from Spring 1997 MHSAA Representative Council Meeting Agenda).)

## III. SPORT–SPECIFIC FACTS

### A. Girls' Basketball

The Court determines that there are a number of specific disadvantages to playing basketball in the fall. After hearing the evidence, the only potential advantage is the possibility that the opportunity for recruitment to play collegiate basketball may be increased because college women's coaches may be able to see teams that play in the fall more often and with fewer NCAA recruiting restrictions. However, the MHSAA did not offer any evidence to prove that this translated into more scholarships or spots on collegiate basketball teams than Michigan girls would otherwise receive.

Regardless, moving girls' basketball to the traditional winter season would still give girls exactly equal opportunity to be recruited for collegiate play as boys' basketball players. Moreover, there is only

---

**5.** John Roberts, MHSAA Executive Director, said in his column "Sports and Their Seasons" in a 1990–91 MHSAA Bulletin, "No one sport can solve all the historical inequities, and no sport can be above consideration as a part of the future solution. Cheerleading cannot be considered in the solution. While cheerleading is certainly a part of the total experience available to boys and girls in the winter, merely defining cheerleading as a sport and counting it toward athletic opportunities for girls in the winter does not satisfy Federal regulations when analyzing opportunities for boys vs. girls in interscholastic sports." (Tr. Exh. 81.)

circumstantial evidence that Michigan girls playing in the winter would not be recruited at the same level that the MHSAA asserts that they are in fall. Finally, the Court finds that girls were originally scheduled to play basketball in the fall to avoid inconveniencing the boys' basketball team, and that kind of historical stigma should be erased.

## 1. General Disadvantages to Playing in Fall

In 1999–2000, 19,760 girls played basketball for MHSAA member schools. (Tr. Exh. 99 at 42–43.) The MHSAA schedules the girls' basketball state championship tournament in the fall. (Stip. Fact No. 41.) For 2001–02, the MHSAA set the first practice date for August 13, the first contest date for August 27, and the end of the season as December 1. (Tr. Exh. 9(a) at 113.) This places the girls' basketball season in the fall. Forty-eight states schedule girls' basketball in the winter. (Tr. Exh. 256.) [6] The National Collegiate Athletic Association (NCAA) also sched-

ules college women's basketball in the winter. (Tr. Exh. 40 at 2.) [7]

The MHSAA schedules the boys' basketball state championship tournament in the winter. (Tr. Exh. 9(a) at 113). For 2001–02, the MHSAA set the first practice date for boys as November 12, the first contest date for December 3, and the end of the season as March 23. (*Id.*) Winter is the season when high schools in the rest of the country play boys' basketball and when the NCAA schedules men's basketball. (Tr. Exh. 256; Tr. Exh. 40 at 2.) The traditional playing season for basketball is the winter. (Tr. at 497:1–4, D. Lopiano).[8]

Plaintiffs presented very credible evidence that the MHSAA's scheduling of girls' basketball in the fall disadvantages girls in several ways. Because Michigan girls play basketball in the fall season, they cannot participate in special events for professional or semi-professional teams, such as playing before or at halftime of a professional game, that take place during the traditional winter season.

**6.** Until recently, 44 states scheduled girls' volleyball in the fall and girls' basketball in the winter. As a result of litigation, three additional states will also be switching seasons to this format. *Pederson v. South Dakota High Sch. Athletic Ass'n,* No. 00–4113 (D.S.D.) (consent decree); *Alston v. Virginia High Sch. League,* 176 F.R.D. 220 (W.D.Va.1997) (settlement agreement following jury verdict in plaintiffs' favor); *Ries v. Montana High Sch. Ass'n,* Case No. 9904008792, slip op. (Mont. Dep't of Labor & Indus. Aug. 11, 2000). A fourth state, North Dakota, has voluntarily agreed to switch the seasons. Jane Bos, *Michigan Soon Will Stand Alone; Four States Moving Girls Hoops to Winter,* The Grand Rapids Press, Aug. 26, 2001, at D10, *available at* 2001 WL 25385084 (reporting on North Dakota).

**7.** As explained earlier, the traditional playing season for a sport is one hallmark that the season is an advantageous time to play the sport, but tradition is not dispositive. In the same manner, the season in which the NCAA

sponsors a particular sport is a hallmark of a traditional, and thus advantageous, season, but it is only one, non-dispositive factor.

**8.** Dr. Lopiano is executive director of the Women's Sports Foundation, whose mission is to expand and enhance opportunities for girls and women to participate in sports and leadership opportunities. (*Id.* at 485:1–11.) Dr. Lopiano, who testified as an expert witness for Plaintiffs, has a Ph.D. in athletic administration with a subspecialization in gender equity in sport. (*Id.* at 490:7–10.) She served as director of women's athletics at the University of Texas, and served on the NCAA committee that produced the first gender equity study for the NCAA. (*Id.* at 491:13–492:3.) At MHSAA's invitation, she has also spoken at MHSAA's Women in Sports Leadership Conference. (*Id.* at 492:4–13.) Further, she provided input in the drafting of the U.S. Department of Education's athletics regulations promulgated under Title IX. (*Id.* at 493:24–494:7.)

(Tr. at 99:8–100:8, Kristi Madsen Testimony.) Michigan's female high school basketball players do not get to participate in "March Madness" or the excitement and publicity surrounding this time period when the rest of the country's high schools and colleges are participating in championship basketball tournaments. (Tr. at 98:1–23, Kristi Madsen[9]; Tr. at 114:20–115:21, Kelsey Madsen.[10])

"March Madness" is the season of the year when basketball is the featured sporting event in the news media because of NCAA tournaments, and a number of promotional events promote basketball and basketball players. Kelsey Madsen testified that "for boys' basketball, it means tournaments and publicity for it and everyone is watching boys' basketball. It's a big hype for the season." (Tr. at 114:23–25, Kelsey Madsen.) High school girls' basketball in Michigan cannot similarly capitalize on the excitement that "March Madness" promotions create in the general public because they are not playing in March. Kelsey Madsen said, "I would love [playing girls' basketball during 'March Madness.'"] It would be awesome, just to know that you're part of something like that, to have an opportunity to play and be known in the season as like 'March Madness.' It's just everyone knows what it is. It would be good." (Id. at 115:16–21.) Kristi Madsen said that not being able, as a high school basketball player, to participate in the "March Madness" hype made her feel "[a]ngry. I

didn't like it. Again, the guys get a ton of special perks or attention because it's 'March Madness' and because they are playing in March, during 'March Madness.'" (Id. at 98:19–23.) Moreover, attention is on the sport of football and the state football tournament in the fall, which is when girls play basketball. (Id. at 99:1–7, Kristi Madsen.)

Because Michigan girls do not play basketball in the winter and because Friday nights are dedicated to boys' football in the fall, girls often must play basketball during school nights on Tuesdays and Thursdays. (Tr. at 29:18–32:6, D. Madsen; Tr. at 93:16–94:9, Kristi Madsen (testifying that she and her teammates "had to bring homework to do at the games or on the bus because we had school the next day on both Tuesday and Thursday nights").) On the other hand, Michigan boys are able to play basketball on Tuesday and Friday nights in the winter. If the girls played basketball during the traditional winter basketball season like the boys, girls would also have the opportunity to play games on Tuesday and Friday nights. (Tr. at 94:2–9, Kristi Madsen; Tr. at 518:1–7, D. Lopiano.)

Moreover, Michigan girls have decreased ability to be nationally ranked or obtain All–American honors because they play basketball during the non-traditional fall season. (Tr. at 501:17–502:2, D. Lopiano.) Dr. Linda Bunker[11] testified that

**9.** Kristi Madsen testified for Plaintiffs. (Tr. at 90:1–4, Kristi Madsen.) Among the many sports she played at various points in high school, Ms. Madsen played four years of both volleyball and softball and three years of basketball. (Id. at 90:15–91:14.)

**10.** Kelsey Madsen, a Northview High School junior, testified for Plaintiffs. She played basketball, volleyball and softball her first two years of high school, and planned to play

volleyball and softball her junior year. (Tr. at 111:3–20, Kelsey Madsen.)

**11.** Dr. Linda Bunker has a Ph.D. in kinesiology and sports psychology and is a tenured professor at the University of Virginia. (Tr. at 651:9–10, L. Bunker.) She was an expert witness for Plaintiffs. Dr. Bunker's research and scholarship focuses on the psychological aspects of sport and the way in which sport contributes to the lives of young boys and

Parade All–American team selections for high school basketball players are made in March. She further testified that "[i]f you play your high school basketball season in the fall, you're not even really eligible to be considered. I mean, you can be legally considered, but everybody's forgotten about you. It's a tremendous disadvantage." (Tr. at 706:1–6, Linda Bunker Testimony.) Not being able to participate in national team rankings and All–American honors "affects [Michigan girls'] visibility to recruiters in terms of college athletic scholarship opportunities." (Tr. at 501:25–502:2, D. Lopiano.) Ms. McGee counters that Michigan girls still can be and are nationally ranked in rankings like the USA Today National Poll and Parade All–American Team. (Tr. at 878:16–21, K. McGee.[12]) The MHSAA did not, however, provide any evidence that suggested that the ability to be ranked was not influenced by the fall playing season.

Girls also lose opportunities to participate in national shoot-outs such as the Nike and Blue Star shoot-outs. These shoot-outs occur in the fall when girls are participating in their high school basketball seasons. In fall 2001, there were eighteen Blue Star shoot-outs between September 16 and October 21 that Michigan girls could not attend because of the scheduling of their high school seasons in the fall. (Tr. at 911:18–913:5, S. Guevara.)

The boys' high school basketball season is approximately three weeks longer than the girls' season, giving boys a greater opportunity to practice and play. (Tr. at 499:23–500:5, D. Lopiano; Tr. Exh. 63

(1998–99 MHSAA Quick Reference Calendar).) Michigan girls, unlike Michigan boys, cannot compete against teams in neighboring states because girls in those states play basketball in the traditional winter season. (Tr. at 503:10–18, D. Lopiano; Tr. at 175:12–22, L. Kostreva (testifying that Menominee boys play basketball against Wisconsin high schools during the MHSAA regular season).) Playing against teams in neighboring states can also lessen travel burdens. (See id. at 171:25–172:8, 175:12–22, 198:7–14 (testifying that Menominee boys need only travel five minutes to play certain Wisconsin schools whereas girls must travel an average of 90 minutes to play other Michigan schools).)

## 2. Recruiting

The testimony regarding the effect that the placement of the girls' basketball season in the fall has on college athletic recruitment opportunities conflicted. The MHSAA argued that Michigan girls have special advantages in being recruited to play on collegiate teams by playing high school basketball in the fall, which are discussed *infra*. Even if this were true, however, it is undisputed that if Michigan girls played basketball during the winter season, they would, at the very least, be on "equal footing" with Michigan boys and with girls in the rest of the country with respect to collegiate recruiting. (Tr. at 851:21–852:4, K. McGee; Tr. at 910:12–16, Sue Guevara Testimony).

Ms. McGee testified that "it's very easy to get [the] kids [she coaches] evaluated in the fall." (Tr. at 795:9–14, K. McGee.)

---

girls and men and women in contemporary society. (*Id.* at 651:14–18.) Besides being a member of several prominent professional sport psychology associations, Dr. Bunker has also received several distinguished awards. (*Id.* at 662:18–663:5.)

**12.** Ms. McGee is athletic director and head girls' basketball coach at Flint Powers Catholic High School. (Tr. at 768:11–14, K. McGee.) She testified on behalf of the MHSAA. She has coached girls' basketball for twenty-nine years and been an athletic administrator for nine years. (*Id.* at 769:2–6.)

While the Court places a good deal of weight on Ms. McGee's impression given her experience in coaching girls' basketball, her testimony must also be considered in light of Flint Powers' status as "one of the most successful" girls' basketball teams in Michigan whose "experiences [might be] different from the run-of-the-mill programs in the state." (*Id.* at 825:14–23.)

Another MHSAA witness on this issue, head University of Michigan (U of M) women's basketball coach Sue Guevara, testified that recruiting in basketball begins long before an athlete's senior year and can, in some cases, start as early as before the ninth grade. (Tr. at 887:19–888:6, 899:17–900:1, S. Guevara.) Ms. Guevara testified that she sees many other women's basketball coaches from around the country, including from prestigious women's basketball programs, at the top girls' games in Michigan, since before the

beginning of October, attending high school games does not count against the forty "contact" limit placed on coaches by the NCAA.[13] (Tr. at 886:7–17, S. Guevara.) In addition, it is more convenient for college coaches to attend high school games during this time since the women's college practices have not started yet. (Tr. at 886:22–887:1, S. Guevara). Ms. Guevara indicated that these factors result in more visibility for Michigan's girls to be recruited, and that she believed that she and her staff would not have the same opportunities to watch and evaluate Michigan girls if they play in the winter season. (*Cf.* Tr. 885:18–20; 891:17–892:19, S. Guevara.)[14]

On the other hand, Plaintiffs point out that to the extent that college basketball recruiting occurs at club tournaments in the fall, Michigan girls cannot play at such tournaments, and therefore cannot be seen by out-of-state recruiters at those events.

13. For purposes of recruiting for collegiate basketball, a "contact period" is when a college coach may contact the athlete and her parents, and coaches are allowed three of those contacts after the period begins. (Tr. at 888:17–19, S. Guevara.) An "evaluation" is when the coach watches the athlete play or asks the athlete's high school for the athlete's transcript. (*Id.* at 888:20–24.)

14. Ms. Guevara also testified that of the forty evaluation days given to women's basketball programs, U of M's program has used between twenty and twenty-five of its annual evaluation days on Michigan girls. (Tr. at 891:5–16, S. Guevara.) It is unclear to the Court, however, whether that number of days would still be used on Michigan girls if the season of play was switched to winter, since U of M women's basketball would obviously continue to use all forty allowed days to evaluate players. The change to winter would not necessarily mean that fewer days than are used now would go to Michigan girls, since they would be playing at the same time that almost every other girls' team in the nation is. Presumably, U of M also has some level of commitment to recruiting Michigan girls

since U of M is a public university. But the Court is clear on Ms. Guevara's general point that she believes that Michigan girls would not be at the same recruiting advantage by playing in the winter.

The MHSAA also provided circumstantial evidence of its recruiting advantages argument by asserting that fifteen female recipients of the Miss Basketball title, given to the top player in the state annually, have played collegiate basketball at out-of-state colleges and universities, whereas only six Mr. Basketballs have done so. (Tr. at 777:4–778:6, K. McGee; Tr. Exh. 285.) The Court places very limited weight on this evidence, and certainly much, much less weight than the testimony of Ms. Guevara. These lists of where the single best player in Michigan was recruited do not prove that recruitment is increased for girls playing in the fall, but is only weak circumstantial evidence of that conclusion. If recruitment were increased, the list does not explain if the fall season alone is the reason or if other factors are present, to what extent all other female basketball players in Michigan are recruited besides the single best player, or what effect moving the season to the winter would have.

(Tr. at 911:18–913:5, S. Guevara (testifying that 18 Blue Chip tournaments occur in the fall at which she evaluates and recruits players).) Ms. Guevara's response to Michigan girls' inability to attend these fall tournaments was that "they don't need to." (*Id.* at 913:3–5.) Michigan college coaches are also still able to attend summer AAU basketball tournaments, where every women's college basketball program is in attendance. (Tr. at 905:9–14, 909:4–7, S. Guevara.)

Plaintiffs also argued that if Michigan girls played in the winter, college coaches would still be able to recruit them just as they recruit girls outside of Michigan. For example, the University of Michigan's women's basketball team plays on Thursdays and Sundays in the winter. (Tr. at 892:1–8, S. Guevara.) If Michigan girls played in the winter on Tuesdays and Fridays—as Michigan boys do—U of M's coaching staff would be able to attend Michigan girls' high school games on those days, even if they conflict with U of M's practice times.

NCAA recruiting restrictions prevent college coaches from watching and evaluating basketball players during "quiet periods" and "dead periods," as defined in the NCAA Manual. (Tr. Exhs.5, 7, 65–66.) During the winter season, however, the NCAA does not set any quiet periods. Instead, the "evaluation period," when players can be observed off-campus, runs October 8–February 28, and the "contact period," when off-campus, in-person recruiting contacts can be made, runs March 1–26. (Tr. Exh. 5 at 3–4; Tr. Exh. 7 at 9.) [15] Thus, the period when recruiters can observe high school players runs through

the fall and winter seasons. The period when recruiters can contact players off-campus is during the winter season.

Plaintiffs also argue that Michigan girls face some recruiting restrictions because of the fall basketball season. In 2001–02, for Division I schools, the NCAA has set "quiet periods" when in-person recruiting contacts are limited to campus visits, for August 1–September 8 and September 30–October 7. (Tr. Exh. 5 at 3–4 (Excerpts from 1999–00 NCAA Recruiting Manual, pages 88–89); Tr. Exh. 7 at 9 (2001–02 NCAA Guide for the College–Bound Student–Athlete).) The NCAA has also set a "dead period," when no contacts are permitted, for November 12–15. *Id.* In 2001–02, practice and the regular season for Michigan girls began during the first quiet period. (Tr. Exh. 9(a) at 113.) During these quiet periods, Michigan girls are playing high school games, presumably making on-campus visits more difficult.

## B. Girls' Volleyball

The Court finds that the MHSAA's scheduling of girls' volleyball in the winter, not a traditional season for girls' volleyball, disadvantages girls in several remarkable ways described in this section. Other scheduling decisions have forced girls' volleyball into a non-traditional season, unlike the other sports with only boys' teams. In volleyball, the non-traditional season is the disadvantageous season for girls.

In 1999–2000, 20,934 girls played volleyball for MHSAA member schools, the largest number of participants in a MHSAA girls' sport. (Tr. Exh. 99 at 42–43 (1999–2000 Athletics Participation Survey).) [16]

**15.** The NCAA limits Division I colleges to forty evaluation days during the evaluation period and sixteen contact days during the contact period. Those days not designated by the college as an evaluation day or contact

day are treated as quiet period days. (Tr. Exh. 7 at 9.)

**16.** The 1999–2000 participation data is found at the last two pages of Trial Exhibit 99.

The MHSAA schedules the volleyball state championship tournament in the winter. (Stip. Fact No. 42.) For 2001–02, the MHSAA set the first practice date as November 15, the first contest date as December 8, and the end of the season as March 16. (Tr. Exh. 9(a) at 113 (2001–02 MHSAA Quick Reference Calendar).) This means that Michigan high school girls' volleyball is played in the winter season.

The traditional playing season for women's volleyball is the fall. (Tr. at 497:21–498:1, Donna Lopiano.) Forty-eight states play high school girls' volleyball in the fall. (Tr. Exh. 256 (National Federal Sport Season Surveys)).[17] The NCAA schedules women's volleyball in the fall. (Tr. at 246:8–9, Bette Norman–Nakamura[18] Testimony.) Although the MHSAA does not currently sponsor boys' volleyball, the MHSAA's executive staff and volleyball committee have recommended that once the sport is adopted, it be played in the spring when the NCAA schedules men's volleyball. (Tr. Exh. 79 at 2 (Excerpts from Spring 1997 MHSAA Representative Council Meeting Agenda).)

College volleyball recruiting focuses on the amateur, private club programs, like those sponsored by an organization called the United States Volleyball Association (USAV),[19] rather than the high school programs because of recruiters' ability to see a far larger number of players in a single setting than at a high school contest or tournament. (Tr. at 326:20–327:6, Charles Erbe[20] Testimony) (testifying that a recruiter can only see twenty-four players at a high school match or 100 players at a high school tournament compared to as many as 5,000 players at a USA Volleyball tournament held over a two to three-day period). The recruiting that occurs in Michigan during the high school girls' volleyball season is mostly limited to smaller in-state schools. (Tr. at 330:8–21, C. Erbe; Tr. at 383:7–16, K. Eveland; Tr. at 427:5–12, Sharon Schatz[21] Testimony.)

The USAV and AAU, another private club program, seasons for high school age players to play in their amateur programs are from January through June or July.

17. As a result of litigation, three states will soon be switching their girls' volleyball to fall and girls' basketball to winter, and one state is voluntarily doing so, bringing the total to forty-eight states who schedule those girls' sports that way.

18. Ms. Norman–Nakamura, who testified on behalf of Plaintiffs, is a teacher with Warren Consolidated Schools in the Detroit area, and a past president of the Michigan Interscholastic Volleyball Coaches Association. (Tr. at 200:17–21, 226:5–21, B. Norman–Nakamura.) She has been coaching volleyball at various levels and in various programs since the 1960s. (Id. at 202:3–15.)

19. This was the acronym used by witnesses to refer to this organization.

20. Mr. Erbe is head women's volleyball coach at Michigan State University and testified on behalf of Plaintiffs. (Tr. at 321:22–23, C. Erbe.) He began his coaching career working with girls' high school programs in California. (Id. at 323:4–13.) He founded the United States Junior National Volleyball Program, which provided most of the players to the 1980 and 1984 USA Olympic women's volleyball teams. (Id. at 323:24–324:17). He also coached the University of Southern California's women's volleyball team to four national championships. (Id. at 324:19–325:10). His teams at Michigan State have perennially finished near the top of the Big 10 Conference standings and participated in the NCAA tournament. (Id. at 325:21–326:6.)

21. Ms. Schatz is president of the Michigan Junior Volleyball Association and coached women's volleyball at Aquinas College, a National Association of Intercollegiate Athletics (NAIA) school, for 15 years. (Tr. at 411:8–13, S. Schatz). She testified on behalf of Plaintiffs.

(Tr. at 206:3–207:5, B. Norman–Nakamura.) MHSAA rules prohibit athletes from participating in USAV or AAU club volleyball during their December through March high school season. (Id. at 221:21–24; Tr. Exh. 9.)

The most competitive club volleyball programs are sponsored by USAV, the sport's national governing body. (Tr. at 327:3–7, C. Erbe; Tr. at 382:15–383:3, Kele Eveland;. Tr. at 1066:7–10, Phil Wilson[22] Testimony.) Outside of Michigan, the USAV club season for high school age girls begins in early January and continues through early July. (Tr. at 206:8–14, B. Norman–Nakamura.)

Michigan girls who participate in high school volleyball are not able to participate in USAV club volleyball until April, after the MHSAA season has ended, while players in other states have been playing club volleyball since January. (Tr. at 328:1–22, C. Erbe.) The MHSAA prohibits students from playing on any team other than a school team during the MHSAA-defined season in that sport. (Tr. Exh. 9(a) at 43 (Regulation I, § 13); Tr. at 453:10–19, Jack Magelssen Testimony.)[23]

By the end of the MHSAA season, most of the regional and national USAV tournaments have been filled by non-Michigan teams. When there are openings, Michigan club teams are placed "at the very bottom of the tournament where they do not get a chance to compete at the high levels because they haven't been competing, they don't have a power rating, [and] they don't have the ranking that other teams do when they do the [seeding]." (Tr. at 328:4–12, C. Erbe; Tr. at 441:7–15, J. Magelssen.)

Michigan club teams have difficulty excelling at these tournaments because they are becoming accustomed to playing with new teammates and a new coach while their competitors have already been playing together for four months. (Tr. at 446:4–14, J. Magelssen.)[24] It is therefore more difficult for recruiters to evaluate Michigan players at these tournaments. (Id. at 446:15–19.)

Playing high school volleyball in the winter rather than the fall affects Michigan girls' ability to be recruited in two ways. First, they are not seen by college coaches who go to the USAV club tournaments to recruit. (Tr. at 328:23–329:3, C. Erbe; Tr. at 386:3–22, K. Eveland.) Second, they miss out on "the experience of competing against a broad base of competition." (Id. at 329:3–14, C. Erbe.) This experience is instrumental in forging a player's psychological framework and confidence that she can "compete against anybody at any level." (Id.)

---

22. Mr. Wilson, a teacher at Kalamazoo Valley Community College and the head volleyball coach at Kalamazoo Central High School, testified on Defendant MHSAA's behalf. (Tr. at 1045:11–17, P. Wilson.) He has coached volleyball at Kalamazoo Central for ten years, and his team won the Class "A" state championship in 1996. (Id. at 1047:8–13.)

23. Mr. Magelssen is a teacher and head volleyball coach at Portage Northern High School, where his teams have won ten state championships. (Tr. at 435:6–9, 436:2–9, J. Magelssen.) Mr. Magelssen has been named MHSAA Class A coach of the year ten times, was a finalist for national coach of the year in 1987, and was national coach of the year in 1994. (Id. at 439:13–20, 440:2–9.) He has also coached USAV and AAU club volleyball since 1984. (Id. at 437:23–438:18.) He testified on behalf of Plaintiffs.

24. When the Michigan club teams are formed they are essentially new teams because MHSAA rules prohibit more than three players from a single school team from playing for their school coach "outside of the MHSAA-defined season for [that] sport." Tr. Exh. 9(a) at 55 (Regulation II, § 11(G)1.e.).

Because of the shortened club season for Michigan girls, over a four-year high school career, they will have 16 months less of competitive training and experience compared to girls in the 48 states that play high school volleyball in the fall. (Tr. at 330:22–331:8, C. Erbe.) This shortened experience disadvantages Michigan girls because recruiters are looking for players "with the most experience." (*Id.* at 331:9–19, 441:5–7, J. Magelssen.) This limited experience affects even those girls who are eventually successfully recruited to play in college volleyball programs. (Tr. at 342:1–7, C. Erbe (observing that his Michigan recruits come into college "less confident," "scared," and "afraid to make mistakes" compared to his out-of-state recruits).)

For example, Kele Eveland,[25] an All–State volleyball player as a junior and senior, received only one handwritten letter [26] from smaller Division II schools during the MHSAA volleyball season. (Tr. at 387:18–23, K. Eveland.) Similarly, Breanna Eveland, a first-team All–State volleyball player as a sophomore and junior, has thus far received only one scholarship offer from a small Division I college and was not currently being recruited by any other schools at the time of trial.[27] (Tr. at 635:2–637:7, B. Eveland.)

In addition, the limits placed on the experience gained by Michigan high school female volleyball players as a result of playing school volleyball in the winter are increasing. "[E]xperience is becoming an overwhelming factor in the recruiting process, and there just aren't Michigan girls

that are at that level." (Tr. at 333:15–20, C. Erbe.) Michigan State's women's volleyball team has no recruited Michigan players as freshmen. Nor will Michigan State have any Michigan players among the incoming freshman recruits in 2002–03. (*Id.* at 333:12–14.)

The MHSAA high school season also disadvantages Michigan girls seeking college athletic scholarships because it occurs after the NCAA's early signing date. Under NCAA rules, high school athletes can first commit to a college program during the second week of November. While there is a subsequent signing date in the spring, the majority of players sign on the first date. (Tr. at 331:20–332:5, C. Erbe.) As a result, a Michigan player is placed at a "severe disadvantage to her counterparts around the nation who are playing high school volleyball in the fall," and whose season is completed or nearly complete by the first signing date. (*Id.* at 332:14–18.) As Mr. Erbe testified:

> [L]et's say I have one scholarship left and I'm looking at a young lady from Illinois and I'm looking at a young lady from Michigan. Because the high school season is in the fall in Illinois, I can go watch that young lady compete to get a final evaluation before I make a decision. I cannot watch the Michigan player because her high school season does not start until after the signing date.

(*Id.* at 332:6–14.)

These recruiting disadvantages affect not only Michigan's elite volleyball players but also Michigan girls with a broad range

---

**25.** In addition to her on-the-court success, Ms. Eveland graduated from high school with a 4.0 grade point average and was valedictorian. (Tr. at 378:8–10, Kele Eveland.) At Georgia Tech, Ms. Eveland made the dean's list both semesters of her freshman year. (*Id.* at 37:12–16.)

**26.** A handwritten letter is a personalized letter to the recruit and indicates a higher level of interest from the college than a typewritten form letter. (Tr. at 388:4–10, K. Eveland.)

**27.** In addition to playing numerous varsity sports, Breanna Eveland has maintained a 3.4 grade point average. (Tr. at 636:4–5, B. Eveland.)

826

of ability who could be recruited by smaller Division I programs, Division II and Division III programs, and NAIA programs. (Tr. at 329:19–330:7, 332:19–23, C. Erbe.) These disadvantages not only cost girls opportunities to participate in college athletics but further harm those girls who, without athletic scholarships or related financial assistance, would be unable to afford to attend college or to attend the college of their choosing. (*See* Tr. at 380:6–16, K. Eveland; Tr. at 562:8–15, Breanne Hall Testimony.) The average Michigan high school volleyball player is two to three years behind players in other states. (Tr. at 369:3–6, C. Erbe.)

Michigan girls cannot be named to All–American teams and their teams cannot participate in national rankings and polls. (Tr. at 444:9–445:1, 447:5–12, J. Magelssen.) This lack of recognition further hinders girls' ability to be recruited nationally. (*See* Tr. at 501:25–502:2, D. Lopiano.)

In addition to reducing college athletic opportunities, Michigan girls' inability to participate in club volleyball programs is itself harmful. Girls miss opportunities to further develop technical skills, as well as the opportunity simply to play. Over the course of a high school career, girls will play sixteen months fewer of volleyball than they otherwise could if volleyball were scheduled in the fall because of the conflict between the club and high school playing seasons. (Tr. at 330:22–331:8, 331:9–19, C. Erbe; Tr. at 441:5–7, J. Magelssen.)

Club volleyball benefits not only the elite player but the "grass roots" player who wants to develop her skills in order to make her high school team. (Tr. at 414:8–12, 429:1–5, S. Schatz ("the players in Michigan are at a disadvantage, whether they are elite or whether they are the kid just trying to make the "A" team in high school because they have restricted amount of time that they can practice out of season, [and] attend clinics").)

In addition, this limits opportunities for girls who live at or near Michigan's borders to participate in volleyball clubs that are close in distance to them. Lynn Kostreva, a teacher and head volleyball coach at Menominee High School, testified that her daughters have been invited to compete on club volleyball teams in Wisconsin but are unable to do so because the Wisconsin club season conflicts with the MHSAA season. (Tr. at 160:1–5, 178:11–23, L. Kostreva.) Menominee is in Michigan's Upper Peninsula, which borders Wisconsin.

Michigan girls are not able to attend college volleyball matches as a team with their coach because MHSAA prohibits such a gathering from occurring out-of-season. (Tr. Exh. 9(a) at 55 (Regulation II, § 11(G)1.e.); *see* Tr. at 180:14–181:8, L. Kostreva (testifying that, because the collegiate season and clinics occur outside of the MHSAA season, she cannot organize and accompany her volleyball team to these events).) Again, such experiences provide "inspirational and aspirational images" to girls. (Tr. at 502:3–10, D. Lopiano.)

As a result of the MHSAA winter season for high school play, Michigan club teams must travel to tournaments as far away as California, Texas and Colorado rather than playing in tournaments in neighboring states, like Indiana, because these later tournaments occur during the MHSAA season or immediately thereafter. (Tr. at 451:18–452:9, J. Magelssen.) Travel greatly increases the cost to play club volleyball, thereby limiting the number of players who can afford to play. (*Id.* at 452:22–453:3 (testifying that playing in annual Indianapolis tournament would cut club ex-

penses by 50 percent).)[28] This kind of travel would also have an effect on academics and other activities of students involved and could make participating in club opportunities impossible.

High school volleyball teams located near Michigan's bordering states are not able to compete against teams in those states. (Tr. at 170:5–10, 175:12–22, L. Kostreva.) For example, Menominee High School is located within 50 miles of numerous Wisconsin high schools that would require shorter travel time for contests. (*Id.* at 175:3–11.) Because of the MHSAA season, however, Menominee is limited to competing against Michigan schools. Contests at schools in Menominee's conference require an average travel time of 90 minutes each way, with the longest trip lasting three hours each way. (*Id.* at 171:25–172:8.) Contests at non-conference schools require even longer travel. (*Id.* at 172:9–15.) In order to arrive on time for an away contest at a non-conference school, Menominee's volleyball team leaves in the middle of the school day and does not return until approximately midnight. (*Id.* at 172:16–173:8.) Because Menominee plays most of its games on Monday and Thursday nights, most of this travel occurs during school days and school nights. (*Id.* at 173:9–13.) In addition, winter weather concerns for travel in the Upper Peninsula, or for locations in Michigan located near any state border, make shorter distances favorable for sports played in the winter season.

Menominee's boys' sports teams, however, are able to play teams from other states. (Tr. at 175:12–22, L. Kostreva (stating that Menominee boys compete against Wisconsin schools in basketball, football and wrestling).) Thus, Menominee's boys can travel as little as five minutes to play a game. (*Id.* at 198:7–14.)

Michigan volleyball players also have difficulty in obtaining specialized volleyball equipment, particularly shoes, because inventories have been depleted by college and high school teams throughout the country before the MHSAA volleyball season begins. (Tr. at 35:7–37:11, D. Madsen; Tr. at 97:5–17, Kristi Madsen Testimony; Tr. at 114:6–17, Kelsey Madsen Testimony.)

The MHSAA's volleyball witness, Mr. Wilson, testified that girls benefit from playing both basketball and volleyball because the skills possessed by most volleyball players—jumping ability and lateral quickness—are valuable in both sports. (Tr. at 1050:11–18, P. Wilson.) There was no evidence, however, showing that girls who play both sports would be denied these skill-related benefits if MHSAA switched the volleyball and basketball seasons. Also, if the girls' volleyball and basketball seasons were switched, volleyball players who desired to play on the basketball team, too, would still have the choice to do so and not participate in club volleyball. The MHSAA also presented no evidence to indicate why facilities problems would prohibit rescheduling of girls' volleyball from the winter to the fall, particularly if it were to be switched with girls' basketball.[29]

---

**28.** To pay for club expenses, players, in addition to parental assistance, seek sponsors, work part-time jobs, and hold fund-raisers. (Tr. at 380:22–381:6, K. Eveland; Tr. at 453:4–8, J. Magelssen.)

**29.** Defendant MHSAA also asserted that the winter volleyball season provides Michigan girls with the ability to play two to three times the number of matches than those competing in states with a fall volleyball season. However, the MHSAA could only provide inadmissible hearsay testimony to support this assertion, which the Court may not consider. (Tr. at 1051:10–12, 1064:3–19, P. Wilson.) In addition, unless Mr. Wilson counts tournament matches or some other special circumstances,

The MHSAA is correct that Michigan girls and their high school coaches have had success in volleyball in which the entire state can take pride. (*See, e.g.*, Tr. Exh. 275; Tr. at 456:5–457:11, J. Magelssen (discussing the great success of 1994 Kalamazoo Dead Frogs in USA Volleyball).) However, the MHSAA failed to prove whether this indicates that the winter, non-traditional volleyball season is not a disadvantage, or whether this merely indicates that the season is a disadvantage that Michigan girls have worked to overcome. The testimony offered by Plaintiffs convinced this Court that the latter is the correct conclusion.

## C. Girls' Soccer

After hearing the evidence, the Court finds that the spring season is the inferior season, as compared to fall, for playing soccer in Michigan. Besides the evidence presented on this point, which was more than sufficient standing alone, the fact that the MHSAA originally scheduled both teams to play in fall, for reasons including the financial advantage to conducting both programs at the same time, is additional circumstantial evidence that fall is a superior soccer-playing season in Michigan.

Some anecdotal evidence was presented that logistical problems would occur if both sexes played soccer in the fall or in one season generally, but that evidence was insufficient for the Court to make a finding that logistical problems, if they exist, are insurmountable now or ever.

In 1999–2000, 11,921 girls played soccer for MHSAA member schools. (Tr. Exh. 99 at 42–43.) MHSAA schedules the girls' soccer state championship tournament in the spring. (Stip. Fact No. 21.) For 2001–02, MHSAA set the first practice date as March 11, the first contest date as March 22, and the end of the season as June 15. (Tr. Exh. 9(a) at 113.) This places Michigan girls' soccer in the spring season.

The NCAA schedules women's soccer in the fall. (*See* Trial Exhibit 40 at 2.) There does not appear to be one clear season in which high school girls play in soccer across the nation, but a number of states employ a number of different scheduling mechanisms for soccer.[30]

The MHSAA schedules the boys' soccer state championship tournament in the fall, at the same time that the NCAA schedules men's soccer. (Stip. Fact No. 21; Tr. Exh.

this assertion does not make logical sense, assuming that the fall and winter seasons are approximately the same length. Certainly the winter season is not two to three times as long as fall, although sometimes it may feel that way in Michigan.

**30.** According to the Court's review of Trial Exhibit 256, twenty-seven states schedule girls' high school soccer in the fall. (Tr. Exh. 256.) Twenty-two states schedule high school soccer in the spring. (*Id.*) Three southern states, Texas, Louisiana, and Mississippi sponsor girls' and boys' soccer in the winter. (*Id.*) These numbers do not add up to fifty-one (counting the District of Columbia), though, because thirty-six states schedule both sexes to play soccer in the same season, which varies between a single fall or single spring season. (*Id.*) Trial Exhibit 256 does not indi-

cate whether those states sponsoring both sexes in the same season have separate-sex teams or if they sponsor co-ed soccer. (*Id.*) The Court also has no indication of how many schools in Michigan may sponsor co-ed soccer teams.

In addition, states using different seasons for male and female soccer sometimes scheduled boys in spring and girls in fall. A couple of states also sponsored multiple seasons, either both fall and spring or all three seasons, for both girls and boys. (*Id.*) This might mean that there is some arrangement where boys' and girls' junior varsity plays together in one season, and the varsity teams of both sexes play in another. Two states do not sponsor soccer at all, and one state did not report seasons for girls' sports. (*Id.*)

40 at 2.) In 2001–02 boys' soccer, the first practice date was August 13, the first contest date was August 24, and the end of the season was November 10. This places Michigan boys' soccer in the fall season. Plaintiffs' expert Ms. Lopiano testified that the traditional playing season for soccer is the fall. (Tr. at 497:8–10.)

The MHSAA's scheduling of girls' soccer in the spring in Michigan disadvantages girls in several ways. Soccer fields in Michigan are often still frozen or snow-covered when the girls' season starts in the spring, so girls are forced inside for practice and tryouts. (Tr. at 598:17–601:17, D. Adrianse; Tr. at 622:14–623:1, Angie Adrianse[31] Testimony; Tr. at 1163:13–1164:2, T. Miller.) Thus, the regular season starts later than scheduled. (*Id.* at 602:7–12, Daniel Adrianse[32] Testimony.) As a result, Michigan girls must play three games a week over the course of the season to make up postponed games whereas Michigan boys play two games per week over the course of their season. (*Id.* at 601:22–602:15.)

The increased number of games per week causes a greater risk of injury for girls that Michigan boys do not face. (Tr. at 602:18–603:17, D. Adrianse) (testifying that his daughter Angie's teams and teams she competed against suffered "a lot of injuries" as a result of playing three days a week); Tr. at 623:2–6, A. Adrianse (testifying that playing three days a week is "really hard on your body" and "practices

can't even be much because you're exhausted").

Girls playing soccer in spring have some post-season tournament dates that occur after the end of the school year, so because there is no ability for contemporaneous in-school promotion of these games, it is less likely that there will be as much student or other fan support as there is for boys' soccer games. (Tr. at 604:11–607:3, D. Adrianse; Tr. at 623:15–624:25, A. Adrianse.)

Girls' opportunities for collegiate recruitment are decreased because college scholarships for soccer are awarded in November and April. (Tr. Exh. 5 at 19–20.) Recruiters will not have had an opportunity to see female soccer players in Michigan in their senior year of high school before awarding first-round November scholarships because girls start their competitive season in late March. (Tr. at 504:6–14, D. Lopiano.) Michigan boys play during the fall season and are able to have four years of high school competition for college recruiters to consider.

The MHSAA's soccer witness was Thomas Miller, a retired teacher who coaches boys' and girls' soccer at Midland Dow High School and former president of the Michigan High School Soccer Coaches Association. (Tr. at 1135:9–19, 1137:3–6, Thomas Miller Testimony.) Asked by MHSAA whether the fall or the spring is advantageous for recruiting, Mr. Miller responded only that "most of the top level

---

**31.** Angie Adrianse currently attends Michigan State University and graduated from Caledonia High School in 2000. (Tr. at 621:11–18, A. Adrianse.) She testified on behalf of Plaintiffs. During high school, she participated in basketball, volleyball, soccer and cross-country, including playing four years of varsity soccer. (*Id.* at 622:1–8.) She received numerous soccer honors, including All Conference, All District and All Region her junior

year. (*Id.* at 622:10–13.) She now plays club soccer for MSU. (*Id.* at 621:24–25.)

**32.** Daniel Adrianse is the father of two daughters who played high school sports while attending high school. (Tr. at 593:6–8, 19–24. D. Adrianse.) He is also a member of Communities for Equity and testified on behalf of Plaintiffs. (*Id.* at 9–10.) His younger daughter, Angie Adrianse, also testified on behalf of Plaintiffs.

players are recruited before their senior year."[33] (*Id.* at 1153:10–15.) Nor was Mr. Miller able to identify when the NCAA letter of intent signing date is for soccer. (*Id.* at 1164:7–9.)

The United States Soccer Federation (USSF) and the American Youth Soccer Organization (AYSO) club soccer seasons for high school age players take place in the spring. The Olympic Development Program (ODP) for soccer takes place during spring and summer for high school age soccer players. Because MHSAA rules prohibit athletes from playing high school sports and club sports during the same season, girls but not boys lose opportunities to participate in USSF, AYSO, and ODP programs. (Tr. at 626:11–629:8, A. Adrianse; Tr. at 504:15–24, D. Lopiano; Tr. at 1168:2–16, T. Miller.) There is some private club soccer in the fall for girls, so in the event that Michigan girls played high school soccer in the fall, girls would have to choose between those programs. (Tr. at 630:18–631:10, A. Adrianse.)

Again, Michigan girls cannot play against schools in the bordering states of Ohio and Indiana because these states conduct girls' soccer in the fall, whereas Michigan boys could compete in both states. (Tr. Exh. 256 at 15, 36.) But two of Michigan's border states, Illinois and Wisconsin, schedule soccer in separate seasons as Michigan does, with their girls and boys playing in the same seasons as Michigan. (Tr. at 1170:13–1171:7, T. Miller; Tr. Exh. 256 at 14, 23, 50.)

Plaintiffs' witness testified that Michigan girls cannot participate in national rankings or All–American individual rankings because their interscholastic season takes place after the fall traditional season. (Tr. at 504:2–5, D. Lopiano.) Of course, reduced visibility would negatively affect ability to be recruited and produces the general disadvantage of less recognition. (*Id.*) Mr. Miller indicated that Michigan girls still have the opportunity to be nationally ranked, but did not indicate the extent to which they have been ranked or if that opportunity is at all impacted by the spring season. (Tr. at 1150:19–1152:19.) The Court therefore does not know whether the ranking takes place during the fall, and thus it is more difficult for girls to be ranked because they are relying on their distant spring season performance, or if there are special spring rankings for high school girls' teams.

There are a few advantages to playing in the spring that girls currently reap. Girls' soccer games are frequently scheduled on Friday nights in the spring season; boys' soccer games are not or are infrequently scheduled on Friday nights in the fall because of the conflict with boys' football games. (Tr. at 1148:19–1149:7, T. Miller; *see also* Tr. at 144:13–147:3, C. Engel.)

In addition, it is more difficult to obtain and provide experienced high school soccer officials during the fall season because colleges also compete in the fall. (Tr. at 1144:13–21, T. Miller.) High schools obtain better officials in the spring during the girls' season. (*Id.* at 1144:22–23.)

**33.** Of course, that conclusion begs the question. If girls are playing in the spring, it is obvious that recruiting would be forced to take place before the senior year for female players. That does not answer whether this is a detriment particular to playing in a spring soccer season, or if recruiting would still take place prior to the senior year even if girls played in fall. It also does not provide any information with respect to players who are not "top level" but who, if they were provided with equal opportunities in high school programs, might still be able to obtain non-scholarship spots on collegiate teams, scholarships in less prestigious collegiate soccer programs, or partial scholarships at better collegiate soccer programs.

Even though it appears that sufficient numbers of people are registered to officiate soccer, registration of soccer officials with the MHSAA does not suggest that officials are either available to work, competent or experienced. (Tr. at 1158:1–4, 1172:13–17, T. Miller.)

Mr. Miller's concerns about changing seasons, however, were all in terms of potential logistical problems that would occur if the seasons were combined, and not if boys' and girls' seasons switched with each other. Approximately one-third of Michigan high school soccer coaches coach both boys' and girls' soccer at their respective schools. (Tr. at 1140:14–19, T. Miller.) It would be difficult to coach both teams during the same season, so some existing coaches would lose one of their coaching positions, and new coaches would have to be hired. (Id. at 1141:8–13, 1156:23–1157:1.) The quality of the surfaces of soccer fields will also decline with twice as many players on them. (Tr. at 1147:22–1148:4, T. Miller.)

Mr. Miller testified that he believes that if boys and girls play soccer in the same season, participation opportunities will decline because schools will have to cut team offerings as a result of logistical problems like finding sufficient officials, coaches, and fields. (Tr. at 1153:24–1154:8, T. Miller.) However, because of the lack of more specific evidence on these points, the Court is not convinced that either alternatives to these problems could absolutely not be found or that these problems would not be able to be resolved after a period of adjustment.

## D. Lower Peninsula Girls' Golf

The Court finds that in Michigan, fall is the more advantageous season for playing high school golf. Again, there was plenty of direct evidence to support this finding, but the fact that the boys' golf program, which was in existence first, was moved from spring to fall also lends circumstantial evidence to the Court's conclusion. Moreover, there was no evidence that logistical difficulties would pose a problem in scheduling boys' and girls' golf at the same time.

In 1999–2000, 3,564 girls played golf for MHSAA member schools. (Tr. Exh. 99 at 42–43.) The MHSAA schedules the Lower Peninsula girls' golf state championship tournament in the spring, at the same time that the NCAA schedules women's golf. (Stip. Fact No. 38; Tr. Exh. 40 at 2.) The MHSAA schedules the golf state championship tournament in the spring for Upper Peninsula boys and girls. (Stip Fact No. 39.) For 2001–02, MHSAA set the first practice date for Lower Peninsula girls' golf as March 11, the first contest date as March 14, and the end of the season as June 1. (Tr. Exh. 9(a) at 113.) This places Lower Peninsula girls' golf in the spring season.

The MHSAA schedules the Lower Peninsula boys' golf state championship tournament in the fall, while the NCAA schedules men's golf in the spring. (Stip Fact No. 37; Tr. Exh. 40 at 2.) For 2001–02, MHSAA set the first practice date for Lower Peninsula boys' golf as August 9, the first contest date as August 13, and the end of the season as October 20. (Tr. Exh. 9(a) at 113.) This places the Lower Peninsula boys' golf season in the fall.

Lower Peninsula boys' golf used to be in the spring, but the MHSAA moved it to the fall season in the 1970s so that boys' golf teams would have better access to golf courses. (Tr. Exh. 10(a) at 6.) The MHSAA scheduled Lower Peninsula girls' golf in the spring, which was the season it had previously determined was less advantageous when it moved boys' golf. (Tr. Exh. 10(a) at 29.)

The traditional playing season for golf is the spring. (Tr. at 497:14–16, D. Lopiano.) But Breanne Hall, who played high school golf for East Kentwood High School and now plays college golf for University of Toledo, testified that fall is the better season for golf in Michigan for a number of reasons.[34] (Tr. at 565:6–569:4.)

In Michigan, it is easier to obtain tee times in the fall rather than the spring, and it is easier to obtain "the use of better courses." (Tr. at 567:8–14, B. Hall; Tr. Exh. 29 at 2 (1973–74 MHSAA Bulletin, vol. L, p. 6).) It is easier to obtain tee times in fall because "[a] lot of people have had all summer to play. By the time when the fall rolls around, a lot of people have put their clubs away. And when the weather starts to get nice [in the spring], everyone [in the general public] is ready to get out there and start playing." (Tr. at 567:11–14, B. Hall.) Thus, girls' teams must compete more with members of the general public for tee times than they would in fall.

In Michigan, the golf courses are in better condition during the fall season. (Id. at 565:12–18.) Girls are more likely to face cold, icy weather and frozen or muddy golf course greens in the spring and do not have the advantage of starting the season on a course which has been groomed all summer. (Id. at 565:12–21; Tr. at 511:5–15, D. Lopiano.) Michigan boys in the Lower Peninsula enjoy these course conditions and availability while Michigan girls do not.

In addition, because the NCAA letter of intent signing date is in early November, Michigan boys have four years of golf experience and scores on which to be evaluated. (Tr. at 564:19–565:1, B. Hall.) Michigan girls only have three years because

their season occurs after the letter of intent signing date. (Id.)

For example, Ms. Hall, an All–State golfer as a junior and senior, was ranked among the top eight female high school golfers in the state and finished third in the state championship tournament. (Tr. at 561:13–17.) Notwithstanding her outstanding senior season, Ms. Hall only received a 50 percent scholarship to Northern Kentucky University, a Division II college, to play golf. (Id. at 558:24–559:7, 561:13–17.) After having a successful freshman year at Northern Kentucky and competing in a tournament against Division I teams, Ms. Hall received a 75 percent scholarship to play golf at the University of Toledo, a Division I college, where she currently attends. (Id. at 558:17–19, 559:8–13, 559:24–560:4.)

Moreover, Michigan boys go straight from summer play to their high school fall season, allowing them to maintain their peak condition and low scores. (Tr. at 565:24–566:8, B. Hall.) Weather conditions do not allow golf courses to stay open during the winter months. (Id. at 565:19–21, B. Hall.) As a result, Michigan girls begin their spring high school season without the benefit of playing during the winter and score more poorly. (Id. at 565:22–566:8.) This affects the recruiting opportunities for Michigan girls because "obviously the coaches want the players with the lower [better] scores." (Id. at 566:14–18.)

The MHSAA pointed out that the spring season has the advantage of being the time when daylight hours are longer, so it is easier to play eighteen holes of golf without missing school than it is in the fall. (Tr. at 571:11–17, B. Hall.) However, this

34. Ms. Hall has earned academic honors as well. She graduated with a 3.8 grade point average from high school and has earned a 3.7 grade point average thus far in college. (Id. at 562:2–7, 563:10–12.)

advantage hardly makes up for the other disadvantages of the spring golfing season.

No significant evidence was introduced to assert that logistics would make maintaining both the girls' team and the boys' team in the same Lower Peninsula golf season difficult or impossible. In addition, Plaintiffs' expert opined that boys and girls golfing together would gain psychosocial benefits from co-ed training and could play mixed tournaments or matches. (Tr. at 668:12–669:11, 706:20–709:17, L. Bunker.)

### E. Lower Peninsula Girls' Swimming and Diving

The Court finds that the winter season for swimming has advantages that outweigh advantages to swimming in fall. The parties presented reasons why they each believe that the fall or winter swimming season is more advantageous than the other season.

All other testimony presented objected to moving the girls' season because of concerns that both sexes in one season would create logistical problems. The Court finds that the opposition to moving girls' swimming to the same season as boys' swimming is mostly motivated by a desire to keep them in separate seasons for administrative convenience in utilizing facilities and coaches, and not particularly because there is a belief that the girls' swimming season is superior or equal to the boys' season. The Court also finds that the anecdotal evidence presented of potential logistical problems was insufficient to prove logistical problems would occur if both sexes swam in the same season. If logistical problems would exist, there was also insufficient evidence that those problems would not have solutions.

In 1999–2000, 6,652 girls participated in swimming and diving for MHSAA member schools. (Tr. Exh. 99 at 42–43.) The MHSAA schedules the Lower Peninsula girls' swimming and diving state championship tournament in the fall. (Stip. Fact No. 46.) For 2001–02, the MHSAA set the first practice date for Lower Peninsula girls as August 13, the first contest date as August 25, and the end of the season as November 17. (Tr. Exh. 9(a) at 113.) The setting of these dates puts the Lower Peninsula girls' swimming and diving season in the fall.[35] The MHSAA schedules the swimming and diving state championship tournaments in the winter for Upper Peninsula boys and girls. (Stip. Fact No. 47.) The entire season for both boys and girls in the Upper Peninsula is placed by the MHSAA in the winter because of the starting and ending dates.

MHSAA schedules the Lower Peninsula boys' swimming and diving state championship tournament in the winter. (Stip. Fact No. 45.) For 2001–02, MHSAA set the first practice date for Lower Peninsula boys as November 19, the first contest date as December 1, and the end of the season as March 9. (Tr. Exh. 9(a) at 113.) This places the Lower Peninsula boys' swimming and diving season in the winter.

The MHSAA rescheduled the girls' swimming season from fall to winter, as Plaintiffs request here, in 1990 because "[t]here had been ten years of effort to expand girls' opportunities in the winter or at least equalize girls' opportunities in the fall, winter, and spring seasons. The Council had statistical information from

---

**35.** There was some indication that the NCAA schedules men's and women's swimming in the winter. (Tr. Exh. 40 at 2.) Ms. Lopiano also testified that the traditional season for swimming and diving is the winter. (Tr. at 497:17–20.) But Mr. Phill testified that college men's and women's teams swim from September and continue through the end of March. (Tr. at 1192:19–23.)

the Department of Education showing unequal opportunities for girls in the winter compared to boys and compared to girls' opportunities in the fall and spring seasons." (Tr. Exh. 44.) In response to this change of seasons, the Michigan Interscholastic Swim Coaches Association (MISCA) hired an attorney to advocate its opposition to this move to the MHSAA's Representative Council. (Tr. at 1196:2–24, Greg Phill Testimony.[36]) Mr. Phill testified that MISCA hired the attorney to express the group's displeasure because "[the coaches] did not want the boys and girls together [in the same season] and we felt that that would be detrimental to the sport." Fifty of the 250 schools offering swimming also complained, and the MHSAA moved the girls' swimming season back to the fall.[37] (Tr. Exh. 45 at 236.)

Plaintiffs argue that the winter season is more advantageous than fall for swimming. For one reason, Michigan boys are able to go straight from the high school swimming season to the club tournaments, whereas Michigan girls have a gap in competition because their season has ended in November. (Tr. at 505:4–506:1, D. Lopiano.) Sectional and regional swim meets for U.S. Swimming take place in March.[38] (Tr. at 1202:7–12, G. Phill.) The Phillips 66 national swim championships are in March/April of each year. (Tr. at 1202:13–24, G. Phill; Tr. at 505:4–506:18, D. Lopiano.) In diving, junior nationals are in March, so girls face a gap in competition between the end of their fall interscholastic season and open amateur competition. (Tr. at 506:19–507:4., D. Lopiano.)[39]

36. Greg Phill, who testified on behalf of Defendant MHSAA, is a swim coach for Livonia Stevenson High School and for Clarenceville Swim Club, a U.S. Swimming program. (Tr. at 1175:23–1176:6, G. Phill.) He coaches the girls' team, has been at Livonia Stevenson for sixteen years, and has been coaching swimming for twenty-five years. (*Id.* at 1176:14–15.) He has also coached and continues to coach an Olympic swimmer, Sheila Taormina, who won a gold medal in 1996 in a relay event. (*Id.* at 1176:16–1177:12.)

37. After Lower Peninsula girls' swimming was moved back to fall, the MHSAA sponsored a competitive cheerleading tournament for girls in the winter to add an athletic opportunity. (Tr. Exh. 52.)

38. Mr. Phill testified, upon questioning by one of the MHSAA's attorneys, that in Michigan, the highest level of regular-season competition is found in high school swimming, as opposed to U.S. Swimming club-level swimming. (Tr. at 1192:8–12.) Presumably, this was in response to the fact that girls miss U.S. Swimming club competition because of the season in which they swim. This does not prove that missing U.S. Swimming competitions is not a detriment, however. Even if it is true that high school competition is higher level, girls who seek additional swimming opportunities through club participation are de-

nied participation in this particular club program or in these particular competitions.

While girls' amateur participation opportunities are affected by missing amateur competitions, the Court finds that recruiting opportunities are not affected one way or the other. Collegiate recruiting is not dependent on seeing the swimmer, since "[b]asically swimming is a black and white sport. You're either this fast or you are not that fast, and that's what they look at. Most college recruiting is done from [an] office." (Tr. at 1190:18–1191:2, G. Phill.) In addition, girls would be able to rely on their final, senior year season performance to attempt to obtain a scholarship or the opportunity for a non-scholarship spot on a collegiate swim team.

39. Plaintiffs' expert testified that this is particularly crucial because Michigan boys are able to do a single "taper," whereas Michigan girls must do a double "taper" to compete in the state championship in the fall and the national championships in the winter. (Tr. at 505:4–506:1, D. Lopiano.) A taper is designed to have a swimmer peak in time for a championship event. It involves intense training over a period of time, usually at the season's beginning, followed by a gradual decline in practice workload so that the swimmer can physically recover and can be primed to swim his or her fastest times. (*Id.* at

Finally, the boys' swimming season is nearly two weeks longer than the girls' season, giving the boys a greater opportunity to practice and compete. (Tr. at 500:25–501:1, D. Lopiano; Tr. Exh. 63 (1998–99 MHSAA Quick Reference Calendar).) [40]

The MHSAA offered testimony on the reasons why the fall season could be considered superior or equal to the winter season for swimming. Mr. Phill said that high school swimming programs in Michigan are flourishing for girls, but declining for boys. (Tr. at 1184:22–1185:17, G. Phill.) He believes that this is because the fall season for girls allows them to transition from summer swimming and clubs to the high school program in the fall, but boys do not have the same incentive to return to winter high school competition after taking the fall season off. (*Id.*) There could well be other reasons for a decline in boys' programs, like the rise of other sports offered for boys in fall, particularly soccer, for example. In addition, Mr. Phill testified that he and other girls' swimming coaches feel that fall is superior to winter for the swimming season because there are not the distractions of the winter season, like exams, the winter break for

the holidays, or spring break. (Tr. at 1181:12–17, G. Phill.)

The rest of the MHSAA's evidence about swimming centered on its assertion that participation opportunities for both girls and boys would decrease if both swam in the same season. Approximately one-third or more of Michigan's high school swimming coaches coach both girls' and boys' programs for their respective schools. (Tr. at 1188:22–1189:1, G. Phill.) Mr. Phill testified that coaches could not coach both teams at the same time. (*Id.* at 1189:2–24.) Clearly, this means that some unknown number of new coaches would have to be hired if boys and girls swam in the same season. There was no testimony regarding how difficult or easy hiring these coaches would be.

Joining the seasons would also cause a decline in club programs that rent pool space from schools. (Tr. at 1187:25–1188:4, G. Phill.) Presumably, this would only occur in the combined season, not in the season when no high school teams would be swimming.

Mr. Phill asserted that the dimensions of swimming pools to which he has been in states where boys and girls swim in the

---

506:2–18.) It is extremely difficult to do tapers in close proximity to each other because of the time and physical exertion required. (*Id.* at 505:12–16.)

Michigan boys are able to focus on a single taper because the national tournaments are usually the week after the MHSAA state championship tournament. (Tr. at 505:16–506:1, D. Lopiano.) Michigan girls do not have that benefit because their high school season has concluded in late November. Michigan boys who dive are able to go straight from their winter season to the national open amateur tournament in March, whereas girls have a competition gap unless they are able to afford a private diving club and continue their training in preparation for the national tournaments. (*Id.* at 506:19–507:4.)

**40.** One of Plaintiffs' experts argued that putting Lower Peninsula swimming and diving into the same season would allow teams to share travel, promotion, coaching, and facility rental time. In addition, she argued that they could swim mixed relay events together and have a swimming program even if there are not enough athletes for a single-sex team. There was simply no empirical evidence presented to enable the Court to make a finding on those assertions. However, the Court believes Plaintiffs' expert's assertion that there can be attendant psycho-social benefits when young males and females train and compete together, in certain circumstances. (*See* Tr. at 668:12–669:11, 706:20–709:17, L. Bunker.)

same season are often 50 meters by 25 yards. (Tr. at 1183:11–13.) There are no high school pools in Michigan with dimensions of that size. (Tr. at 1183:15–17, G. Phill.) There was no testimony regarding how well Upper Peninsula schools manage, in terms of having sufficient pool space, in offering swimming to both sexes in the winter. Mr. Phill further testified that at Livonia–Stevenson High School, where he coaches, the girls' "B" team would have to be eliminated if the seasons were joined.[41] (Tr. at 1186:13–20.)

## F. Girls' Tennis

After reviewing the evidence, the Court finds that spring is the more advantageous playing season for tennis. In addition, the MHSAA presented no evidence that both sexes playing tennis in the same season would create logistical problems.

In 1999–2000, 8,759 girls played tennis for MHSAA member schools. (Tr. Exh. 99 at 42–43.) MHSAA schedules the girls' tennis state championship tournament in the fall. (Stip. Fact No. 36.) For 2001–02, MHSAA set the first practice date as August 13, the first contest date as anytime after the first practice, and the end of the season as October 20. (Tr. Exh. 9(a) at 113.) These decisions place girls' tennis in the fall.

MHSAA schedules the boys' tennis state championship tournament in the spring, at the same time that the NCAA schedules women's and men's tennis. (Stip. Fact No. 35; Tr. Exh. 40 at 2.) For 2001–02, MHSAA set the first practice and contest dates for boys' tennis as March 11 and the end of the season as June 1. (Tr. Exh. 9(a) at 113.) This places the boys' tennis season in the spring. The traditional playing season for tennis is the spring. (Tr. at 497:11–13, D. Lopiano.)

Boys' high school tennis immediately precedes the United States Tennis Association (USTA) summer tennis tournament circuit, so boys have the advantage of high school practice, competition, and coaching before participating in the circuit and are better prepared for the summer circuit, where college coaches watch play. (Tr. at 508:4–509:3, D. Lopiano; Tr. at 700:21–701:13, L. Bunker.) In addition, the girls' high school tennis season is approximately 20 days shorter than boys' tennis. (Tr. at 500:20–24, D. Lopiano; Tr. Exh. 63.)[42]

## IV. PSYCHOLOGICAL AND GENERALIZED HARMS TO MICHIGAN GIRLS

The current scheduling of seasons harms Michigan girls in a number of ways that can be generalized across all of the sports at issue in this case. First, the practice of scheduling only girls' sports, but not boys' sports, in disadvantageous and/or non-traditional seasons sends the clear message that female athletes are subordinate to their male counterparts, and that girls' sports take a backseat to boys' sports in Michigan. (See Tr. Exh. 81 at 1.) It also deprives girls of contemporaneous role models, skills development, and team-building opportunities.

---

**41.** Mr. Phill testified that the Livonia–Stevenson girls' team currently has sixty-four girls, whereas he expects the boys' team to have eighteen in this winter's season. (Tr. at 1183:18–24.)

**42.** Putting girls' and boys' tennis into the same season would allow teams to share travel, promotion, coaching, and facility rental time. They could play mixed doubles matches together and have a tennis program even if there are not enough athletes for a single-sex team. Moreover, there are psychosocial benefits from young males and females training and competing together. (Tr. at 668:12–669:11, 706:20–709:17, L. Bunker.)

These scheduling practices also have a negative effect on the gender role socialization of Michigan's girls.[43] Treating boys and girls differently and inequitably in athletics can contribute to or cause girls and boys to have dramatically different perceptions of self-worth and to cause girls to have lower expectations for themselves. (*Id.* at 676:13–19.)

When girls are treated unequally as compared to boys, girls receive the psychological message that they are "second-class" or that their athletic role is of less value than that of boys. (Tr. at 494:9–556:1, D. Lopiano; Tr. at 673:3–15, 679:11–680:13, L. Bunker.) Being scheduled in a non-traditional season, or in a season that is clearly disadvantageous while boys are scheduled in the clearly advantageous season, gives girls this "second-class" status message. (Tr. at 638:25–639:6, B. Eveland; Tr. at 340:17–344:22, C. Erbe; Tr. at 450:19–451:5, J. Magelssen; Tr. at 137:2–137:11, C. Engel.)

This message stays with girls throughout adulthood and can extend to careers and interpersonal relationships. (Tr. at 673:16–674:12, L. Bunker.) When girls receive separate and unequal treatment, this teaches them to expect discrimination, so that they may not even recognize discrimination when it occurs. (*Id.* at 714:1–715:8.) In addition, girls may be wary of change because they do not know what to expect or fear that the situation could become even worse for them.[44] (*Id.* at 679:11–683:19, 715:9–21; *see also* Tr. Exh. 254.[45])

Differential and unequal treatment of boys and girls in the scheduling of seasons can psychologically affect girls in negative ways. (Tr. at 679:11–680:13, L. Bunker.) If girls recognize that boys always play in the traditional seasons while girls play in the non-traditional seasons, coupled with other unequal treatment such as prime time game scheduling, girls may develop unhealthy coping mechanisms to rational-

**43.** Gender role socialization is the psychological term used to explain how an individual learns what is expected of him or her based on his or her sex. (Tr. at 665:24–666:03, L. Bunker.)

**44.** Dr. Bunker examined a study conducted by the Office for Sex Equity and Education of the Michigan State Department of Education on the perception of boys and girls and their interactions in the school environment. (Tr. at 670:10–20, L. Bunker; Tr. Exh. 105 (4/92 Report: "The Influence of Gender–Role Socialization on Student Perceptions").) While the Court gives this study very little weight in its consideration of the evidence, it is interesting to note that the results of this study done in Michigan tend to confirm the expert opinions of Dr. Bunker.

This study asked Michigan high school boys and girls to imagine their reaction if they woke up the next morning as a member of the opposite sex. (Tr. at 671:4–8, L. Bunker.) Twenty-two percent of the female respondents indicated that they had at some point wanted to change gender. (Tr. Exh. 105 at 3, 11–12; Tr. at 671:8–11, L. Bunker.)

In contrast, only three percent of the male respondents said they had ever considered wanting to be a girl. (Tr. Exh. 105 at 3.) "More than any other item," girls who wanted to change gender believed they would receive better athletic opportunities. (Tr. Exh. 105 at 11–12; Tr. at 671:8–11, L. Bunker.) Boys, on the other hand, perceived that if they were a girl they would receive second-class treatment. (Tr. at 676:17–19, L. Bunker.)

**45.** In a survey conducted by Western Michigan University and commissioned by the MHSAA for this lawsuit, girls who were asked to comment on the possibility of changing their sports seasons indicated some concern that if seasons changed or combined with boys' seasons, girls would end up with worse practice or playing times or other disadvantages. For example, one girl said, " . . . Putting sports like basketball or tennis into the same season for both boys and girls is probably a disadvantage to the girls. This is because many schools will treat the girls teams as if they aren't important. The girls will not get as good practice or coaching in many cases." (Tr. Exh. 254 at 43.)

ize away the unfair treatment. (*Id.* at 680:2–13.)

One of these mechanisms might be to establish lower expectations. That is, a girl will recognize she is being discriminated against but expect that this will continue for the rest of her life and assume she must adjust to the discrimination rather than seek to change it. (Tr. at 680:17–22, L. Bunker.)

For example, Kristi Madsen, a former high school athlete, testified that she felt that it "hurts" girls' self-esteem "[w]hen you look to your counterparts, the males, and they are playing in the right seasons, they get all the benefits that come along playing in the right season, and then you look at where you are, I think it hurts [self-esteem]." (Tr. at 109:8–17, Kristi Madsen; Tr. at 16:7–17:10, D. Madsen (testifying that her daughter believed that she has to be "good enough to play on a boys' team" in order to receive equal benefits in athletics).)

Discriminatory treatment of girls also has an effect on boys. Boys receive the message that girls are inferior and are harmed by that message. (Tr. at 135:24–137:16, 141:18–142:2, Connie Engel [46] Testimony; Tr. at 671:22–25, L. Bunker.) As parent Connie Engel said, "This is creating a situation where [my son] believes that girls are second-class .... My children, my son and my daughters, don't get to experience [basketball's "March Madness"] together and they know that they are treated differently." (Tr. at 137:2–137:11, C. Engel.)

In addition, there are other harms, which could seem minor to some, but in the aggregate act to reinforce the inconvenience and unfairness of playing in a disadvantageous season. For example, girls playing sports outside of their traditional seasons have difficulties obtaining current season equipment for the sport. (Tr. at 35:7–37:11, D. Madsen; Tr. at 97:5–17, Kristi Madsen Testimony; Tr. at 114:6–17, Kelsey Madsen Testimony; Tr. at 494:9–556:1, D. Lopiano.) Girls also have diminished opportunities for recognition in national athletic publicity and rankings, like USA Today's weekly Top 25 high school rankings, or all-America honors, like from Parade All–America or McDonald's All–American teams. (Tr. at 494:9–556:1, D. Lopiano.) In addition, Michigan girls are denied the experience of participating in promotional events like basketball's "March Madness," national shootouts, three-on-three tournaments, and similar competitions. (*Id.*)

Furthermore, Michigan's seasons differ from a majority of other states, or many other states, depending on the sport. Girls transferring in or out of Michigan schools mid-year can be prevented from playing a season of interscholastic athletics because they have missed the season. Playing out of a traditional season also limits one's choice of opponents, as well, including the ability to play teams in neighboring states. In addition, girls who end up playing in college must adjust to different collegiate seasons. (Tr. at 712:20–713:10, L. Bunker.)

Because the MHSAA schedules some girls' sports, *but no boys' sports,* in non-traditional seasons, girls, *but not boys,* must choose among sports they already play when they enter high school. (Tr. at 32:9–34, D. Madsen.) For example, girls who play sports in community recreation

---

**46.** Connie Engel is the mother of three children, two daughters and one son, who attended or currently attend Forest Hills Central High School and who all participated in or currently participate in interscholastic athletics there. (Tr. at 126:17–127:12, C. Engel.) She is also a founding member of CFE. (*Id.* at 134:19–20.)

programs before high school often play with boys in the same, traditional and/or more advantageous seasons. (*Id.*) But when girls enter high school, they must choose between sports when some of those sports are scheduled in different seasons and create conflicts, and boys do not face this choice. (*Id.*)

Finally, participation opportunities for girls in the winter are limited, perhaps as a result of this scheduling. The MHSAA schedules five sports for boys in the winter, basketball, wrestling, ice hockey, skiing, and swimming and diving. (Tr. Exh. 63.) Three winter sports are scheduled for girls: volleyball, gymnastics, and skiing. Very few MHSAA member schools have girls' gymnastics or skiing teams, (Tr. Exh. 99), so most Michigan girls have the opportunity to participate in one winter sport, whereas boys would have three or four, depending on the availability of boys' skiing and ice hockey. "The vast majority of Michigan high schools conduct only one sport for girls in the winter. Fewer than 20% sponsor two sports. Fewer than 2% sponsor three sports. The addition of girls swimming in the winter schedule at more than 200 schools fills a desperate need for many MHSAA member schools and their female athletes." (Tr. Exh. 44 (Editorial by MHSAA executive director John E. Roberts, 1990–91 MHSAA Bulletin).) Girls' swimming was later moved back to fall, however.

## V. DEFENDANT MHSAA'S JUSTIFICATIONS FOR CURRENT SEASONS

The MHSAA has argued that the girls' sports at issue in this lawsuit are scheduled in superior or equal playing seasons. This is an argument that this Court wholly rejects after reviewing the facts presented at trial for the reasons described in the previous sections.

In addition, the MHSAA has presented a set of justifications for scheduling girls' seasons as it has that fall into the categories of available facilities, coaches and officials, i.e., concerns that logistical limitations require putting the sexes in separate seasons in order to maximize participation slots in every sport. These concerns, while legitimate, would at most permit the MHSAA to schedule girls' and boys' teams in separate seasons, but the two sexes would have to split advantageous and disadvantageous sports equally. It is clearly not equitable for girls to play in all of the disadvantageous seasons and for boys to play in none of them. Nonetheless, for reasons discussed both in the previous section and in this section, Defendant MHSAA presented insufficient evidence in all of the sports at issue that logistical concerns could not be resolved if both sexes played in the same season.

Finally, the MHSAA presented arguments that absolutely do not legally justify providing Michigan girls with different and unequal treatment. These arguments were that Michigan girls prefer seasons as they are, which, among other problems, the Court found to be a dubious conclusion; that member schools prefer the current seasons; and that girls' programs need an "independent identity" from boys' programs, which is allegedly provided by putting girls in a different season. These are discussed below.

### A. Logistical Concerns

#### 1. Facilities

Ensuring the greatest number of participation opportunities for children in interscholastic sports is a legally legitimate goal, as well as wise policy. To this end, being able to sponsor freshman and junior varsity teams, larger squads, and maximum playing time for the most young people are also legally legitimate goals. (*See*

Tr. Exh. 106.) Nonetheless, the Court is not convinced that the MHSAA's scheduling system maximizes participation or is the only method by which to maximize participation because insufficient evidence on these points was presented. Moreover, the Court finds that administrative convenience against a historical background of treating girls' athletics inequitably, and not actual empirical evidence, is a major cause of existing scheduling.

The MHSAA argues that it cannot schedule basketball, soccer and swimming concurrently for boys and girls because there are insufficient gymnasiums, soccer fields and pools in Michigan. (Tr. at 1139:18–19, T. Miller Testimony; Tr. at 1183:1–17, G. Phill; Tr. at 799:11–23, K. McGee.) To combine seasons in some or all separately-scheduled sports, the MHSAA argues, would have the effect of reducing participation opportunities for both boys and girls by forcing schools to cut team size or cut freshman or junior varsity teams.

However, considering that the MHSAA bore the burden of production and persuasion on this point, the evidence presented was insufficient to convince the Court. The evidence was almost exclusively anecdotal. For instance, the MHSAA did not present enough evidence at trial to demonstrate how many schools have inadequate facilities to allow girls and boys to swim or play soccer in the same season. In terms of pool space, thirty of the forty-three states sponsoring boys' and girls' swimming schedule the seasons concurrently. (Tr. at 1200:18–22, G. Phill; Tr. Exh. 256; Tr. Exh. 62.) The boys' and girls' swimming teams in Michigan's Upper Peninsula also swim in the same season. (Stip. Fact No. 47.) In addition to boys' teams, MHSAA member schools accommodate other teams in the winter by renting their pools to swimming club teams. (Tr. at

1187:21–1188:4, G. Phill.) Even assuming that Mr. Phill's assertion that the size of the Livonia–Stevenson pool would force him to cut participation on the Livonia-Stevenson girls' team is true, that says nothing about what alternatives have been considered, like community pools, or what the situation is in the rest of the state.

In terms of soccer field space, thirty-seven of the forty-eight states sponsoring boys' and girls' high school soccer schedule the seasons concurrently. (Tr. at 1162:16–20, T. Miller; Tr. Exh. 256 (1999–2000 National Federation Sport Season Survey).) Moreover, soccer fields in Michigan are now being used concurrently by boys and girls because girls' club teams are playing in the fall (when boys' high school teams are playing) and boys' club teams are playing in the spring (when girls' high school teams are playing). (Tr. at 1164:24–25, T. Miller.) The soccer situation is similarly unclear to this Court to make a finding that logistical problems would exist in the event that girls and boys played in the same season.

Assertions have been made that some schools may have difficulties accommodating both girls and boys in the same season in swimming and/or soccer, but it does not suggest to what extent this would be a problem. More importantly, there was no indication whether any facility alternatives are possible and have been considered, or if the position that facilities are simply inadequate to accommodate girls and boys at the same time throughout Michigan has been adopted without further study because that is the conventional wisdom.

The MHSAA did not present any evidence that boys and girls cannot play tennis or golf in the same season. Moreover, there was evidence at trial, which the MHSAA did not refute, that girls and boys can play basketball in the same season

with little difficulty, if any, if girls' volleyball is moved to the fall season.

In terms of gymnasium space, a school with a single gym can accommodate boys' and girls' basketball teams practicing and playing concurrently. (Tr. at 459:22–460:12, J. Magelssen (testifying that most Michigan schools in Classes A, B, C and D have one gym that accommodates various indoor sports simultaneously); Tr. at 941:1–8, James Glazier[47] Testimony (testifying that there would be no problem at his current school and previous school if volleyball and girls' basketball facilities were switched).) For instance, Michigan high school gyms already have boys' basketball and girls' volleyball teams practicing and playing concurrently.

Practice times can be alternated weekly or each season so that boys practice right after school one week or season and the girls practice right after school the next. (Tr. at 517:20–25, D. Lopiano.) Boys' and girls' basketball games can likewise be played in the same season through "normal scheduling mechanisms" used in the 48 states in which boys and girls play basketball at the same time. (*Id.* at 517:17–518:11.) For example, boys' and girls' games can be scheduled so that one team or the other is playing at home, or they can play doubleheaders and flip-flop times in a doubleheader so that girls and boys have an equal opportunity for prime time. (*Id.*) Girls' basketball teams currently do not have to share gym space with volleyball or boys' basketball teams. But "having the gym to yourself [is not] a justifiable reason for treating boys different from girls." (Tr. at 833:15–834:4, K. McGee.) In addition, playing in the fall, with no other teams needing gym space then, has not given at least some girls' basketball teams the ability to play games

on Friday nights, since boys' football plays that night. (Tr. at 93:16–94:9, Kristi Madsen.)

It is true as the MHSAA points out that if girls' volleyball and basketball were switched, and girls' volleyball players had increased opportunity to play club volleyball, they would have to make a choice between club volleyball and high school basketball. (Tr. at 1050:25–1051:9, 1062:14–1063:4, P. Wilson.) Nonetheless, this is a choice for a young woman and her family to make, not the MHSAA. Girls are entitled to equal opportunities to be able to make these choices.

The MHSAA points to the high ranking of Michigan among the states for numbers of boys and girls participating in various sports as evidence that the current scheduling of seasons maximizes participation opportunities and argues that scheduling is the reason why participation numbers are what they currently are. (*See* Tr. Exh. 219 (1999–00 National Federation Sports Participation Survey).) The argument is that other states, who in many sports schedule both sexes in the same season or schedule girls in a different season than Michigan does, have lower participation numbers than Michigan because those states' scheduling creates problems that decrease participation opportunities for students. This is circumstantial evidence that simply proves little, in that the comparison between Michigan's participation numbers and other states' participation numbers is not apt.

First, one would expect Michigan to rank at least eighth in the nation in numbers of participants in each sport, since Michigan has the eighth highest population in the country. *See* 1999–2000 Census. So ranking among the top ten states in a

---

**47.** Mr. Glazier is former athletic director at Grandville High School and is currently assistant principal at Caledonia High School. (Tr. at 916:6–12, J. Glazier.)

sport's participation numbers is not particularly instructive. Even where Michigan ranks higher than eighth, there are an unlimited number of other factors that influence participation numbers besides seasons, like school funding in general and athletic program funding in particular, the number of schools in a state sponsoring a particular sport, cultural attitudes in a state, the influence of weather on outside sports, etc. Without more, the Court cannot draw the conclusions from this data that the MHSAA asks be drawn.

## 2. Officials and Coaches

The MHSAA argues that it cannot schedule soccer and swimming for boys and girls concurrently because there are insufficient numbers of coaches in Michigan. (*Id.* at 1139:20–23, T. Miller; Tr. at 1189:14–24, G. Phill.) Similarly, the empirical evidence on this point was too sparse to make a finding that this is true. The circumstantial evidence that logistical problems could be resolved or would not exist in the first place was just as strong.

The MHSAA further argues that it cannot schedule soccer for boys and girls concurrently because there are insufficient numbers of officials in Michigan. (Tr. at 1140:8–13, T. Miller.) There are no special qualifications to officiate soccer matches between MHSAA member schools. A prospective official need only register with the MHSAA, which involves passing an open-book examination on MHSAA's rules and regulations, and pay a registration fee to the MHSAA. (Tr. at 1158:17–20, T. Miller.) The MHSAA asserted, but did not demonstrate, that some schools could have trouble finding "qualified" MHSAA-registered game officials, but there was little evidence that MHSAA-registered game officials would be unqualified if more were needed in a single season or if the existing officials were needed for more games during a single season.[48]

Thirty-seven states, as well as Upper Peninsula schools, are able to schedule boys' and girls' soccer concurrently. (Tr. Exh. 256; Stip Fact No. 47.) Presumably, the Upper Peninsula[49] and those other states have enough officials and coaches. Thirty states are able to schedule boys' and girls' swimming concurrently and presumably provide an adequate number of coaches. Upper Peninsula schools likewise have boys and girls swim in the same season with a presumably adequate number of coaches. (Stip. Fact No. 47.)[50]

## B. Michigan Girls Prefer the Current Seasons

The MHSAA asserts that, based on a survey that it commissioned Western

---

**48.** In addition, Ms. Norman–Nakamura, who testified on behalf of Plaintiffs, agreed on cross-examination that she is aware that some volleyball coaches oppose changing the girls' season because they believe that volleyball officials would not be as available during the fall season when college teams compete. (Tr. at 278–283, B. Norman–Nakamura.) However, the MHSAA did not offer the testimony of coaches holding these beliefs, nor any other evidence to support this claim.

**49.** Clearly, the Upper Peninsula has a much smaller population than most states and the Lower Peninsula of Michigan, but the Upper Peninsula's experience is comparable in that while the number of teams, and thus the number of officials and coaches needed, would be smaller, so would the total population from which those officials and coaches could be drawn.

**50.** Moreover, there was only some discussion of whether it would be possible for boys and girls to be coached by the same individual and/or practice together to save resources like coaches and facility usage. If such an arrangement were logistically possible and outweighed other disadvantages, Plaintiffs' experts also testified that there is psycho-social benefit to boys and girls training together where appropriate.

Michigan University's Evaluation Center to conduct after this lawsuit was filed, Michigan girls prefer to play in the current seasons. (Tr. at 1014:22–1016:9, 1020:21–23, Daniel Stufflebeam[51] Testimony; Tr. Exh. 254 (4/15/99 Sports Seasons Survey Final Report).) The Court reads the results of that survey differently than the MHSAA does, as discussed below. Moreover, the Court notes that while a number of accomplished high school and college student-athletes testified about the disadvantages of the current seasons, the MHSAA did not offer the testimony of any girl or parent who was in favor of keeping the current seasons.

In addition, the survey suffers from design flaws and bias, some of which the Court will review here. Dr. Stufflebeam testified that the survey form listed potential negative consequences of moving the girls' seasons at issue in this case and asked girls how objectionable they found those consequences. (Tr. at 1036:11–1037:6, D. Stufflebeam; Tr. Exh. 254 at 18.) No benefits of changing the seasons were presented to the surveyed girls. (See Tr. Exh. 254.) Further, Dr. Stufflebeam testified that the potential negative consequences identified in the survey were provided by the MHSAA's attorneys. (Id. at 1037:7–1038:23.) No consultation was done with Plaintiffs' attorneys for suggestions of positive benefits to changing seasons to ask girls about in the survey, nor was any independent analysis conducted to determine the potential benefits and detriments of moving any seasons. This was likely because of the time pressures involved in conducting this survey under the parameters placed on the Evaluation Center by the MHSAA's attorneys, based on

when it was needed for this litigation. (Id. at 1020:21–1023:23, 1031:7–20.)

Sixty of MHSAA's 729 member schools participated in the student survey. (Tr. at 1026:6–13, D. Stufflebeam.) Only one-third of the girls in these 60 schools were surveyed, and nearly one-third of respondents participated in sports that are not played in disadvantageous seasons. (Id. at 1026:6–13, 1029:3–6.)

In addition, the original, written survey responses were destroyed after the data from them was entered into a database, but before Plaintiffs or their expert could review them. (Tr. at 1029:16–1030:5, D. Stufflebeam.) Thus, it is impossible to tell what subjective answers where girls could write comments match to what objective responses to the objective questions, and therefore, it is impossible to ascertain why girls with certain opinions may have held those opinions.

Even setting aside these flaws, the Court is not at all convinced that the survey results themselves support the MHSAA's position that Michigan girls largely prefer current scheduling. In responding to the question of whether "all high school sports seasons should be the same as college," for example, 31.4 percent of the respondents said no, 31.3 percent said yes, and over 37 percent had no opinion. (Tr. at 1030:13–22, D. Stufflebeam; Tr. Exh. 254 at 26.) This is hardly overwhelming support for maintaining current, non-traditional seasons employed by most of the girls' seasons at issue in this lawsuit.

Moreover, some of the survey responses of the female athletes that indicated that some of those who opposed changing seasons did so because they feared boys would receive better treatment and prac-

**51.** Dr. Daniel Stufflebeam is director of the Evaluation Center at Western Michigan University, which conducted the survey for the MHSAA. (Tr. at 986:13–17, 998:21–999:9, D. Stufflebeam.)

tice times if the girls moved to the same playing seasons as boys. (Tr. Exh. 254 at 39 *et seq.;* Tr. at 1031:7–1035:9, D. Stufflebeam.) If girls and boys play a sport in the same season, however, individual schools are under legal obligation to give girls and boys equal treatment in practice and game times, for example.

In addition, the Court has some concern that girls would indicate a desire not to change simply in order to avoid being branded troublemakers or because they have come to believe that an inequitable situation is their lot in life. For example, one respondent said, "I think sports seasons are good the way they are—I would like girls' sports to be a bigger deal, but I don't want to put up a stink." (Tr. Exh. 254 at 43.) In sum, the collection of opinions of girls presented from the WMU Survey does not show that the current seasons are equitable or even that Michigan girls believe that they are equitable.

### C. Member Schools Prefer the Current Seasons

The MHSAA argues that the majority of member schools, most recently in 1998, have indicated that they prefer the current seasons. (Tr. Exh. 39 (1998 Survey Form); Tr. Exh. 229 (1973, 1979, 1981, 1985 & 1994 School Surveys).) The Court notes first that if, after applying the facts to the law, the seasons as they have been currently set by the MHSAA violate the law, they violate the law regardless of the preferences of the member schools.

To the extent that the Court has considered preferences of the member schools, as the Court could ascertain those through the available evidence, it has only been in the context of assuming that member schools may have had actual non-discriminatory reasons based on empirical facts for preferring certain seasons for certain sports over others.

It is also possible, however, that school representatives may prefer seasons the way they are simply for administrative convenience, since school representatives have a great deal else to do every day besides consider this one issue. The Court has also considered this possibility and has thus given very little weight, if any, to the member schools' preferences, as expressed on the MHSAA surveys, as an indication of whether the current sports seasons are legally equitable. A comprehensive study of the possibilities of changing seasons, as well as the advantages and disadvantages of various seasons, should have been the task of the MHSAA. The Court has instead relied much more heavily on the facts presented in this litigation regarding the benefits and disadvantages of different seasons for different sports.

In addition, the form of the MHSAA's surveys over the years made them of very little use to this Court. For example, the MHSAA prepared two draft survey forms for its 1998 survey. (*See* Tr. Exh. 40.) One form asked the schools for their position on each separate sport (so that a school could indicate whether, for instance, it would favor moving basketball and volleyball but not swimming). The second form, which MHSAA actually sent the schools, asked the schools for their position on whether all sports should be moved with no option to vote in favor of moving certain sports but not others. (*Id.* at 2.) The straight, "up or down" vote approach, which is the one that was used, has obvious limitations, since there are a number of ways in which seasons scheduling could be changed. In addition, the survey form used provided information only on potential coaching conflicts based on current coaching arrangements, but does not provide any other information as to whether additional coaches could be hired. (*Id.*) Finally, the survey provided no look at

schools' other reasons for desiring the status quo. (*Id.*)

Finally, the MHSAA has placed sports seasons without regard to survey results or moved sports seasons without first surveying member schools, including boys' golf, girls' soccer and girls' swimming. (Tr. Exh. 29 at 2; Tr. Exh. 10(d) at 5; Tr. Exh. 81 at 1.) More member schools (sixty) voted to schedule the soccer seasons separately than those who wanted the seasons together (eighteen), but most schools expressed no preference (507) or otherwise did not vote on this issue or at all. (Tr. Exh. 229 (1981 Survey—Soccer).) After the MHSAA placed both soccer seasons together in the fall, several school administrators complained, and girls' soccer was moved to spring. (Tr. Exh. 47 at 3; Tr. Exh. 10(d) at 5.) The MHSAA originally placed girls' basketball in the fall even though girls' basketball coaches and many schools originally wanted to stay in winter, where it was before it was sanctioned by the MHSAA, and ignored the initial vote of girls' basketball coaches to move the season back to winter. (Tr. Exh. 78.) The MHSAA unilaterally moved girls' swimming in 1990–91 from fall to winter "as a matter of fairness, a matter of trying to do the most good for the most number of girls," before it was moved back to fall. (Tr. Exh. 44.)

### D. Giving Girls an "Independent Identity"

The MHSAA asserted at trial that playing basketball in the fall rather than the traditional winter season benefits girls because they do not have to compete with boys' basketball for attention of many kinds, and thus receive increased recruiting opportunities and media coverage. (*See* Tr. at 794:3–22, 796:14–16, K. McGee.) Ms. McGee, the MHSAA witness who offered the assertion, said she felt that putting girls in a separate basketball season demonstrated that girls could bring fans out to their games and be successful in basketball without a contemporaneous companion boys' team in the same season. (*Id.* at 794:3–17.) But Ms. McGee also acknowledged that it is true that if MHSAA moved the girls' basketball season to the winter, Michigan girls would be placed on an "equal footing" with Michigan boys and girls in the rest of the country. (*Id.* at 851:18–852:4.)

The concept of having an "independent identity" is also based on the premise that boys will "overshadow" girls in fan support and media coverage if boys and girls play basketball in the same season. (Tr. at 829:23–830:1, 846:3–7, 849:4–850:6, K. McGee.) This conflicts with giving girls a separate season so they can prove that their program stands on its own. With all due respect to Ms. McGee, who obviously cares a great deal about coaching and the girls that she coaches and only wants the best for female players, the Court finds that separate basketball seasons sends a message that the girls' basketball programs cannot be "fitted in" to the "regular" basketball season of winter. Girls' basketball programs, however, are just as important as boys' programs, and girls deserve to play in the "regular" season, too.

In addition, to achieve this "independence," girls, among other things, play basketball on two school nights because "football is on Friday nights" in the fall. (Tr. at 825:24–828:11. K. McGee.) The winter season makes it feasible for boys to play basketball on Tuesdays and Fridays. (*Cf.* Tr. at 94:2–6, Kristi Madsen.)

Ms. McGee's assertion that girls' basketball in the fall receives more media coverage than boys' football in the fall is based on girls playing twice a week, and therefore receiving post-game coverage twice a

week, and boys playing football once a week, and therefore receiving post-game coverage once a week. (Tr. at 832:9–25, K. McGee.) Ms. McGee, however, provided no documentation supporting her assertion that girls receive more media coverage in the fall compared to boys' football. (*Id.*) In addition, Ms. McGee coaches one of the most successful girls' basketball programs in Michigan. Other girls' basketball programs may very well not receive the same quantity and quality of media coverage that Flint Powers' program does, even if playing in the fall season has some effect on the quality and quantity of media coverage received generally.

Moreover, Dr. Linda Bunker testified that if girls were in fact to receive less media coverage compared to boys by playing basketball in the winter, it is better preparation for adulthood for girls to recognize this and decide for themselves how they will handle situations that they view as inequitable. (Tr. at 738:10–25, L. Bunker.) If girls "ha[ve] the opportunity to visually see they are not being given the same amount of press coverage, then they have an opportunity to do something about it, whether it's they or the newspapers or the parents or the community, have a chance head on to address the issue of inequities." (*Id.*)

### CONCLUSIONS OF LAW

### I. PLAINTIFFS' FOURTEENTH AMENDMENT CLAIM

#### A. Defendant MHSAA is a State Actor

The Fourteenth Amendment to the United States Constitution provides, "... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within

its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. To be liable under 42 U.S.C. § 1983 for violating the Fourteenth Amendment, an entity such as Defendant must be considered a "state actor."

The United States Supreme Court found recently that another state's high school athletic association, the Tennessee Secondary School Athletic Association (TSSAA), was a "state actor" after considering facts regarding the TSSAA's make-up and role in the administration of high school athletics in Tennessee. *See Brentwood Academy v. Tennessee Secondary School Athletic Ass'n,* 531 U.S. 288, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). The Supreme Court noted that, "The nominally private character of the [TSSAA] is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness in applying constitutional standards to it." *Id.* at 298, 121 S.Ct. 924. Among the facts that the Supreme Court found relevant to reaching this determination were a TSSAA membership of predominantly public schools; revenue coming from membership dues and gate receipts from tournaments held at member schools; state officials given *ex officio* status on the legislative council; and eligibility of TSSAA employees for the state employees retirement system. *Id.* at 298–300, 121 S.Ct. 924. The Supreme Court noted that a mechanism is required to implement interscholastic sports schedules and competition rules governing Tennessee's schools, and that mechanism took the form of public school officials acting together under the auspices of the TSSAA. *Id.* at 299, 121 S.Ct. 924.

When the Sixth Circuit held that the TSSAA was not a state actor, the MHSAA was adamant that it was very similar in structure to the TSSAA. *See Brentwood*

*Academy v. Tennessee Secondary School Athletic Ass'n,* 180 F.3d 758 (6th Cir.1999); (Supplementary Motion by Defendant MHSAA, 9/1/99, Dkt. No. 183; Renewed Motion by Individual Defendants, 9/1/99, Dkt. No. 182 ("the nature and function of the MHSAA is virtually *identical* to that of the TSSAA") (emphasis added).) This Court, however, felt that other decisions of the Supreme Court and other federal circuits necessitated the conclusion that the TSSAA was a state actor. *Communities for Equity,* 80 F.Supp.2d at 738. Thus, there was still an open factual question for trial whether the MHSAA was a state actor, even though based on the facts presented at that time, this Court agreed with the MHSAA that it was nearly identical to the TSSAA. *Id.;* (Order, 8/31/01, Dkt. No. 452.)

■ The Supreme Court eventually reversed the Sixth Circuit, finding that the factual inquiry proved the TSSAA to be a state actor. *Brentwood Academy,* 531 U.S. at 298, 121 S.Ct. 924. Similarly, this Court finds that the facts presented at trial clearly necessitate a finding that the MHSAA is a state actor.

The purpose of the MHSAA—to create, establish and provide for, supervise and conduct interscholastic athletic programs throughout the state—is virtually the same as its Tennessee counterpart. The MHSAA has a membership of predominantly public schools and almost every eligible public school belongs. Its revenue is derived from gate receipts from tournaments held at member schools and broadcast fees, among other items, revenues to which schools would otherwise be entitled. The membership of the MHSAA's Representative Council includes a representative of the state superintendent of education and is comprised of mostly public school employees acting as representatives for their schools. Some MHSAA employees

continue to be eligible for participation in the state employee retirement system. Moreover, the MHSAA exercises adjudicative power over the schools with its ability to investigate and determine rules violations and resultant sanctions.

Just as the Supreme Court recognized that a mechanism is required to implement interscholastic sports schedules and competition rules governing Tennessee's schools, that mechanism in the State of Michigan takes the form of public school officials acting together under the auspices of the MHSAA. This is clearly correct and strongly supported by the evidence presented in this case. For example, Ms. McGee, now a member of the Representative Council, said, "[I]t would be chaos" with "a system of high school sports where there is not a level playing field ... by when [schools] compete against each other." (Tr. at 869:8–14.) In addition, the MHSAA's own position paper on school choice notes that,

> Over the years, responsibility for regulating interscholastic athletics changed hands and organizations changed names, but always there have been provisions for statewide governance of interscholastic athletics. The MHSAA has been the serving and controlling organization for 67 years.... [T]he need for coordination of rules between districts [in non-athletic activities] has never risen to a level that a statewide regulatory body has been created to enforce a statewide code of rules and penalties [like in athletics].

(Tr. Exh. 22 at 3.) Finally, the MHSAA's developmental history is evidence of the fact that the State of Michigan felt that such a body was needed. Its legal status and official designation may have changed over the years, but as this Court has said before, the crucial question of its relationship with Michigan schools has not.

Being found to be a "state actor" is not a punishment, as Defendant suggests. (*See* Defendant's Proposed Findings of Fact and Conclusions of Law, 10/24/01, Dkt. No. 515 ("How long must the MHSAA pay for its historical relationship with the State that was ended through the legislative process in 1971?").) To the extent that it is a burden to ensure compliance with the Fourteenth Amendment to the United States Constitution, it is the honorable burden and duty of all entities and individuals acting with the power entrusted to them by their fellow citizens to ensure that they treat all American citizens fairly and with due regard for their rights. The role that the MHSAA has assumed, and particularly the power that it has been given to fulfill that role, leaves this Court with the firm conclusion that "there is no substantial reason to claim unfairness in applying constitutional standards to it." *See Brentwood Academy,* 531 U.S. at 298, 121 S.Ct. 924.

**B. Michigan Girls Have Been Denied Equal Protection By Current Seasons**

To state a Fourteenth Amendment claim, Plaintiffs must also allege that Defendant treats high school boys differently from girls. *See United States v. Virginia,* 518 U.S. 515, 532–33, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). Once Plaintiffs have established a gender classification, the burden of justifying the classification shifts to Defendant, and the justification must be "exceedingly persuasive." *Id.* Defendant must show at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives. The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females.

*Id.* at 533, 116 S.Ct. 2264 (citations omitted). It is undisputed that Defendant intentionally treats boys and girls differently by scheduling their interscholastic sports seasons at different times of the year. Girls are treated differently from boys in two ways. First, some of the sports that girls are offered that are the same as offered to boys, e.g., basketball and golf, are played in a different season than the boys play. Second, volleyball, the only sport at issue with only a girls' team, is played in a season different from the "traditional" volleyball season, whereas no sport with only a boys' team, e.g., football or wrestling, is offered in a "non-traditional" season.

Thus, the remaining question for this Court to decide is whether Defendant meets its burden of establishing an "exceedingly persuasive" justification for treating girls and boys differently. In other words, this Court must determine if Defendant's classification of boys and girls via their sports teams' placement in the current seasons "serves important governmental objectives," and the chosen scheduling is "substantially related to the achievement of those objectives." *See id.* at 533, 116 S.Ct. 2264. The Supreme Court, while discussing the "exceedingly persuasive" standard for sufficient justification, noted that its current direction in cases of classification by gender focused on the differential treatment or denial of opportunity for which relief is sought. *Id.* at 532–33, 116 S.Ct. 2264.

Animus on the part of Defendant is not required for a finding of a Fourteenth Amendment violation where a rule or classification treats males differently from females on its face. Here, the classification

of the MHSAA mandates that, for example, boys will play tennis in the spring, but girls will play tennis in the fall. That is a classification that on its face treats boys and girls differently. In another case involving a sex classification, *United States v. Virginia*, Virginia was found to have denied women equal educational opportunity on the basis of sex by refusing to allow any woman to attend Virginia Military Institute (VMI). *See* 518 U.S. at 530–534, 116 S.Ct. 2264 (citing other cases of facial classification by sex creating unlawful discrimination, like *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (holding unconstitutional an Idaho law requiring that when several persons are equally entitled to administer a decedent's estate, males must be preferred to females); *Stanton v. Stanton*, 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975) (holding unconstitutional a Utah law that parents support male children until age 21, but support female children only until age 18)).

Virginia was not, however, found to have displayed animus toward women in excluding them from VMI. 518 U.S. at 532–34, 116 S.Ct. 2264. Such a finding must be made in cases of discrimination shown through disparate impact, where a rule or classification treats males and females the same by its terms, but the effect of the law is different on males and females. In those cases, intentional discrimination must be proven by showing that the body adopting the law or classification did so with the intent of discriminating against one sex or other protected group, i.e. some kind of animus. *Washington v. Davis*, 426 U.S. 229, 241–242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (where the District of Columbia required all police officer applicants to pass exam, and fewer black applicants passed than white applicants, test did not deny equal protection unless exam was used for invidious, discriminatory purposes instead of legitimate purposes). For example, where the Kentucky High School Athletic Association had a rule requiring that 25 percent of its member schools indicate a willingness to sanction a new sport before that sport would be sanctioned, female athletes claimed that the rule disproportionately served to deny them sports opportunities. *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 269 (6th Cir.1994) (*Horner I*). Because the rule did not treat females differently from males in its requirements, the athletes had the burden of proving intentional discrimination by showing that the *facially neutral* "25 percent rule" was adopted for the purpose of denying them opportunities, and not for a legitimate purpose. *Id.* at 272.

It is common sense that it is not necessary to find animus, i.e., a discriminatory purpose, for a Fourteenth Amendment violation to be present in the case of a classification that on its face differentiates between males and females. If a class of persons is treated differently because of an immutable characteristic like sex, and that different treatment harms that class of persons for reasons not justified by an "exceedingly persuasive" justification, the affected class of persons is no more or less harmed by the unjustified discriminatory treatment merely because Defendant does or does not have animus toward them. A Fourteenth Amendment violation can exist even if it was perpetrated by those who believe that they have honorable intentions.

Therefore, motive plays only a limited role in the case before this Court. If the scheduling of seasons harms female athletes, Plaintiffs need not prove that Defendant MHSAA scheduled male and female seasons differently with invidious intent to harm female athletes. But the MHSAA's "benign" justifications for different treatment are not to be accepted automatically,

since tenable justifications must describe actual purposes of Defendant, not rationalizations for actions that were, in fact, differently grounded. *See Virginia,* 518 U.S. at 536–37, 116 S.Ct. 2264 (citing *Weinberger v. Wiesenfeld,* 420 U.S. 636, 648 & n. 16, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975)); *Califano v. Goldfarb,* 430 U.S. 199, 212–13, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977). *See also Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 727, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) (finding no resemblance between the "alleged objective" of excluding men from nursing school in order to engage in "educational affirmative action" benefitting women and the "actual purpose underlying the discriminatory classification," and thus rejecting the state's justification for the intentional discrimination on the face of the admissions rule) (*cited in Virginia,* 518 U.S. at 536, 116 S.Ct. 2264).

In addition, Defendant MHSAA cannot prevail by attempting to demonstrate that its intent was to help or protect girls by scheduling their sports when they have been if that "help" actually harms them or is based on paternalistic notions. *Cf. Frontiero v. Richardson,* 411 U.S. 677, 684–85, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (finding that stereotyped distinctions between the sexes in law and official action at issue were made because of paternalistic notions where male military officers could automatically claim wives as dependents for extra benefits, but female military officers had to prove that husbands were financially dependent to claim them as dependents).

As an initial matter, Defendant MHSAA is clearly responsible for the current placement of the sports seasons. Having the ability to set the beginning and closing dates of a season, to schedule the championship tournament, and to punish those who play the sport outside of the MHSAA-designated dates is obviously the ability to schedule a season. The fact that individual schools, conferences, and leagues decide competition dates within the parameters of the season is of no consequence. It is the parameters that determine what time of year a sport is played.

Defendant MHSAA must show that its classification between the sexes in scheduling sports' seasons serves important governmental objectives and that this scheduling is substantially related to the achievement of those objectives. The MHSAA's justification or justifications must be "exceedingly persuasive." The Court finds that the MHSAA has not met this burden.

The Court has concluded that none of the girls' sports at issue are scheduled in the advantageous season, for reasons fully explained in the Findings of Fact. The MHSAA's only other legitimate asserted objective for the separate scheduling, and in the case of volleyball, non-traditional scheduling, is to maximize athletic participation opportunities for both boys and girls. The MHSAA argues that its current scheduling system maximizes high school athletic participation opportunities by creating optimal use of existing facilities, officials and coaches, thereby permitting more teams in a sport or more spots on a team. The MHSAA also argues that the quality of the programs are maximized by the current scheduling, as well, as a result of the better officials and coaches being able to work over two separate seasons with both boys and girls, instead of splitting their time in one season between boys and girls or forcing schools to broaden the pool of officials and coaches, opening up positions to people the MHSAA asserts would be less qualified individuals.

While these logistics-based objectives are "important," the Court concludes that the discriminatory scheduling is not "sub-

stantially related" to the achievement of those asserted objectives. The empirical evidence was wholly insufficient. The MHSAA chose to rely on anecdotal and weak circumstantial evidence instead, which is not enough. Even assuming that the MHSAA had sufficiently proven this point, that would not justify forcing girls to bear all of the disadvantageous playing seasons alone to solve the logistical problems. Moreover, the logistics justification smacks of post hoc rationalization for a system that only in the relatively recent past decided that girls were entitled to play sports and be treated fairly in athletics. As a result, this Court comes to the conclusion that Defendant MHSAA violated and continues to violate the Fourteenth Amendment of the United States Constitution by its current scheduling of seasons for the sports at issue.

## II. PLAINTIFFS' TITLE IX CLAIM

### A. Defendant MHSAA is Subject to Title IX by Virtue of Its Controlling Authority Over Interscholastic Athletics in Michigan

■ Section 901(a) of Title IX of the Education Amendments of 1972 provides, with exceptions not applicable here, that "[n]o person in the United States shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ...." 20 U.S.C. § 1681(a) (2001). For Plaintiffs to prevail on their Title IX claim, they must first establish that Defendant MHSAA is subject to Title IX.

This Court held earlier during the course of this litigation that "any entity that exercises controlling authority over a federally funded program is subject to Ti-

tle IX, regardless of whether that entity is itself a recipient of federal aid." *Communities for Equity v. Michigan High Sch. Athletic Ass'n*, 80 F.Supp.2d 729, 735 (W.D.Mich.2000). Based on the findings of fact, the Court must decide the extent to which Defendant MHSAA exerts control over interscholastic athletic programs of Michigan high schools, which are almost all federal funding recipients, to determine if Title IX applies to Defendant. *Id.* at 738. If Defendant exerts controlling authority over the scheduling of interscholastic sports seasons in Michigan, Defendant will be subject to Title IX's non-discrimination requirement in its scheduling of the seasons.

In *NCAA v. Smith*, the Supreme Court expressly declined to consider whether "controlling authority" is a basis on which an entity can be subject to Title IX. *NCAA v. Smith*, 525 U.S. 459, 470, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999). The Sixth Circuit Court of Appeals also has not considered the "controlling authority" question. This Court extensively outlined its reasons for finding that Congress intended to apply Title IX to those entities exercising controlling authority over a federal program or programs, whether or not the entity itself is a recipient of federal funding, in its previously published opinion in this case on this topic. *See Communities for Equity*, 80 F.Supp.2d at 733–35. Defendant MHSAA urges the Court to reconsider this position on this issue, but the Court declines to do so.

Defendant cites to an opinion by another federal district court taking the opposite position of this Court and holding that entities not receiving federal funds may not be held liable under Title IX. *See Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n of Illinois*, 134 F.Supp.2d 965, 970

(N.D.Ill.2001).[52] This Court, in previously discussing this issue, noted that the Supreme Court has previously held that Title IX has "two related, but nevertheless somewhat different objectives... Congress wanted to avoid the use of federal resources to support discriminatory practices; [and] it wanted to provide individual citizens effective protection against those [discriminatory] practices." *Communities for Equity*, 80 F.Supp.2d at 733 (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 704, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)). This Court then found that:

Not only is Defendants'[53] suggested interpretation of Title IX unsupported by the plain meaning of Title IX and the *Cannon* decision, it is empty formalism. If Defendants' interpretation prevailed, Title IX would prohibit "recipients" of federal funds from discriminating on the basis of sex, but would allow entities that controlled those funds to discriminate so long as those entities were not themselves "recipients." Such a scheme would not only encourage "recipients" of federal funds to transfer control over those funds to others (because both parties could thereby avoid Title IX liability), it would allow federal funds to promote gender discrimination so long as the recipients of those funds empowered someone else to promulgate the discriminatory policies. In this Court's view, such a formalistic interpretation is not warranted by the meaning or purpose of the statute.

*Communities for Equity*, 80 F.Supp.2d at 734. The federal district court in *Johnny's Icehouse* criticized the above reason-ing of this Court with the argument that a funding recipient, like a school, may be liable if it fails to respond appropriately to discriminatory acts of non-agent third parties. *Johnny's Icehouse*, 134 F.Supp.2d at 970 (citations omitted). Therefore, "controlling authority" liability under Title IX is not necessary to achieve the purposes of Title IX. Further, the *Johnny's Icehouse* Court reasoned that "controlling authority" liability is not authorized by Title IX.

This Court, however, respectfully disagrees with that reasoning. It is true that the Supreme Court has held funding recipients not liable for the discriminatory actions of their "agents" under Title IX, pursuant to a *respondeat superior* theory, where there is no evidence that a funding recipient knew or should have known about the discrimination. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (*cited in Johnny's Icehouse*, 134 F.Supp.2d at 970). In *Gebser*, a case where a school was sued for its failure to prevent sexual harassment by a teacher against a student, the Supreme Court held that "a damages remedy will not lie under Title IX *unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf* has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Gebser*, 524 U.S. at 290, 118 S.Ct. 1989 (emphasis added).

However, an entity with "controlling authority" over a recipient is not an agent of the recipient by the very nature of their

---

52. Presumably because most Federal Circuit Courts, as well as the Supreme Court, have not taken up the issue, the court in *Johnny's Icehouse* recognized that its decision faced the "undeniable potential for a contrary ruling," as this Court recognizes that its decision does. *See Johnny's Icehouse*, 134 F.Supp.2d at 971.

53. At the time of that opinion, the MHSAA and a number of individuals were Defendants in this suit, but the individuals have since been dismissed.

relationship; instead, the recipient becomes like an agent and the controlling entity like a principal in the relationship. In situations like the one in this case, the nature of what needs to be accomplished by a group of recipients (here, controlling and regulating athletics) requires that the funding recipient-schools cede their own ability to control many aspects of their schools' athletic programs to the controlling entity-athletic association. Thus, after the recipient schools cede authority, if a recipient school believes that an athletic association is illegally discriminating, that one school alone has no authority or ability to stop the athletic association, unless it can convince a sufficient number of other schools and those schools together would be able to change the association's action.

A school's only immediate recourse to stop its own "participation" in the discrimination is to discontinue offering an athletic program to its students, since the school cannot realistically offer a program without belonging to the association. In effect, one individual school cannot, in fact, be held liable for the association's Title IX violation because the recipient-school no longer has the "authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf." See Gebser, 524 U.S. at 290, 118 S.Ct. 1989. It is true that "a funding recipient may be liable if it fails to respond appropriately to the discriminatory acts of nonagent third parties," Johnny's Icehouse, 134 F.Supp.2d at 971, but the law must fill the gap where the recipient has no effective way of responding appropriately because of its rela-

tionship with the third party. "Controlling authority" theory is needed to address this deficiency and effectuate the intent of Congress when it passed Title IX.

Moreover, contrary to Defendant MHSAA's other argument, "controlling authority" theory is consistent with what has been called the "contractual" character of Title IX. Title IX is legislation enacted under the Spending Clause, or in other words, is an exercise of Congressional power to fix the terms upon which federal funds will be disbursed. Cf. Guardians Ass'n v. Civil Service Comm'n of City of New York, 463 U.S. 582, 598–99, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (White, J.) (discussing Title VI); see also Department of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597, 605, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986) ("Under the program-specific statutes, Title VI, Title IX, and § 504, Congress enters into an arrangement in the nature of a contract with the recipients of the funds: the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision.").

Against this background, Johnny's Icehouse found that imposing Title IX obligations on "any . . . entity not in contractual privity with the federal government or without the power to decide whether or not to accept federal financial assistance— would not fit into the Spending Clause foundation for the statute." Johnny's Icehouse, 134 F.Supp.2d at 970.[54] However, the Third Circuit case that Johnny's Icehouse cited for that proposition specifically did "not suggest that an absence of privity means that in no circumstances may a

---

**54.** Johnny's Icehouse cited to an opinion discussing Title VI, but courts have generally drawn analogies between Title IX, Title VI, and § 504 of the Rehabilitation Act of 1973 because of the similarities in these laws. See NCAA v. Smith, 525 U.S. 459, 467–69, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999) (looking at case law interpreting § 504 of the Rehabilita-

tion Act to interpret Title IX); Department of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597, 600 n. 4, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986) (Title VI case law can generally be relied on to interpret later statutes, like Title IX). This Court will draw the same analogies where case law concerns Title VI or § 504.

controlling authority argument be viable; we note that those who truly assume control of federally-funded programs are in a position to accept or reject that control as part of a decision whether or not to receive federal funds indirectly." *Cureton v. NCAA,* 198 F.3d 107, 118 (3d Cir.1999). The Third Circuit instead suggested that an absence of contractual privity between the entity sued and the federal funding source should give a court caution in imposing Title VI, or Title IX, obligations on the entity sued. *See id.*

This Court has heeded the persuasive warning of caution from the Third Circuit, and after consideration, believes that "controlling authority" theory is consistent with the contractual nature of liability under Title IX. Normally, contractual privity between the entity sued and the federal funding source should be required to hold the entity liable under Title IX, and this is the situation covered when indirect recipients of federal aid are subject to the requirements of Title VI, Title IX or § 504. *See Grove City College v. Bell,* 465 U.S. 555, 563–64, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984) (holding that college was subject to Title IX, even where students directly received the federal aid in loans and grants, but college was the indirect recipient of that aid).[55]

In another case, the Supreme Court held that airlines could not be subjected to a program-specific statute, § 504 there, because they were mere "beneficiaries" of federal funds, but not indirect recipients of airports' federal funding. *Paralyzed Vet-*

*erans,* 477 U.S. at 607, 106 S.Ct. 2705 (citing *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984)). The Supreme Court there distinguished between colleges and airlines in these two cases by noting that an "intended recipient" of federal funds was liable under the program-specific statutes like Title IX, so colleges were liable because Congress meant to deliver money to them using college students as conduits, but airlines were not liable because Congress was not trying to aid them and they were mere beneficiaries of the funding. *See id.* at 606–07, 106 S.Ct. 2705.

In that vein, holding entities with "controlling authority" power over recipients liable under Title IX is consistent with the contract-like nature of Congress' power under the Spending Clause to set conditions for the use of federal money. A "controlling authority" over a funding recipient is more than a mere beneficiary of federal funds and is instead more like a recipient of the funds through its control of important parts of the funding recipient's program. Congress grants federal money to states and school districts to help pay for educational programs generally, making non-discrimination conditions on the funds. When an educational program like interscholastic athletics requires a governing body like the MHSAA—a body having "controlling authority" over member schools in certain aspects of the educational program—the MHSAA accepts the conditions in which member schools must operate when it implicitly contracts

---

**55.** *Grove City College* continues to be good law on the point for which this Court cites it. Part of *Grove City College* was subsequently superceded by Congressional action, however. The Supreme Court also held in *Grove City College* that Title IX was only intended to apply to the particular program or activity receiving the indirect assistance. *Grove City College,* 465 U.S. at 570–74, 104 S.Ct. 1211.

Congress later enacted the Civil Rights Restoration Act of 1988 to clarify that the Supreme Court misinterpreted its intent in the coverage of Title IX and the other program-specific statutes, legislating instead that the coverage was broader than the specific program receiving assistance. *See* Civil Rights Restoration Act of 1987, Pub.L. No. 100–259, 102 Stat. 28 (1988).

with the federal government to become responsible for organization of interscholastic athletic programs funded in part by federal resources.

The MHSAA is not an indirect recipient of federal funds, because it does not receive dues from the coffers of member schools, which has been the basis of Title IX liability for other state high school athletic associations. *See Horner*, 43 F.3d at 272 n. 5 (finding the Kentucky High School Athletic Association to be subject to Title IX as an indirect recipient of federal funds). But the MHSAA receives revenues to which member schools would otherwise be entitled, like tournament receipts, souvenir sales, and broadcast fees, and it operates tournaments largely using public facilities and public employees. Moreover, the MHSAA's legislative functions are conducted by mostly public school employees representing their schools. Finally, the MHSAA understands its function as controlling and regulating certain parts of member schools' athletic programs and has thus implicitly contracted with the federal government and had notice to obey the conditions under which member schools receive federal funding, funding which helps schools run athletic programs in the first place.

Defendant MHSAA clearly is the "controlling authority" over schools when it comes to scheduling of the sports seasons. Again, the MHSAA's power to declare beginning and closing dates of a season and dates of championship tournaments, as well as to punish those who play the sport outside of the MHSAA-designated dates, is the power to schedule a season. No member school alone or even in concert with many other schools has the power to do this. A single school or consortium of schools, no matter how large, would still have to seek action within the MHSAA to

change seasons. Therefore, Plaintiffs' evidence has firmly proved that Defendant MHSAA exerts "controlling authority" over the scheduling of interscholastic sports in the State of Michigan such that the MHSAA must comply with the mandate of Title IX.

### B. Defendant MHSAA Has Violated Title IX With Its Current Seasons Scheduling

Plaintiffs must next establish that Defendant MHSAA's current scheduling of interscholastic sports seasons violates Title IX. The Court finds that Plaintiffs have established a Title IX violation. The United States Department of Education, as a federal department empowered to extend federal financial assistance to any education program or activity, has been directed to promulgate rules and regulations consistent with the objectives of Title IX. 20 U.S.C. § 1682 (2001).

As applied to interscholastic athletics, the Department of Education has promulgated the following regulation:

> No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such activities separately on such basis.

34 C.F.R. § 106.41(a). To the extent that Plaintiffs have demonstrated that female high school athletes are denied the benefits of school athletic programs as a result of the scheduling system of Defendant MHSAA that they would otherwise enjoy if they were male, Plaintiffs have proved a Title IX violation.[56]

---

**56.** Title IX claims in the area of athletics often fall into two categories corresponding to the

In addition, the federal agency originally charged with interpreting regulations and investigating alleged violations of Title IX has noted that elements of a program's structure like seasons of play can constitute a violation. Practices such as employing disadvantageous playing seasons for only one sex violate Title IX when the resulting harms are substantial enough to deny equal participation opportunities and benefits in athletics to students of one sex. *See* Department of Health, Education, and Welfare, Office for Civil Rights (OCR) Policy Interpretation, 44 Fed.Reg. 71413, 71416–71418 (1979). OCR also considers "[w]hether disparities in individual segments of the program with respect to benefits, treatment, services, or opportunities are substantial enough in and of themselves to deny equality of athletic opportunity." *Id.* at 71418.

Finally, Defendant MHSAA continues to make the erroneous argument that it does with respect to Plaintiffs' Fourteenth Amendment claim that a claim under Title IX requires proof that the MHSAA had animus toward girls. It does not. "Intentional discrimination" in the context of a Fourteenth Amendment violation means only that the MHSAA needs to have intended to treat girls differently from boys by intentionally scheduling them in different seasons than those in which boys play, which it clearly did, or by scheduling the girls-only sport of volleyball in a "non-traditional" season when boys-only sports are always played in "traditional" seasons, which it clearly did. As explained *supra*, that kind of "intentional discrimination" can be justified under certain circumstances, even though the Court has found that in this case it is not.

A Title IX violation similarly does not require proof that the MHSAA intended to hurt girls and chose the scheduling system as a way to do that. The Court's task is to analyze the resulting athletic opportunities for girls and boys from the different treatment that they experience by being placed in different athletic seasons, and if girls receive unequal opportunities, Title IX has been violated. Different treatment can still result in equal opportunities for boys and girls, but it also may not, which is the reason for analyzing and comparing the benefits and the burdens of the differential treatment.

Language in a Fifth Circuit case is relied on by Defendant MHSAA who asserts that Title IX requires Plaintiffs to show that Defendant intended to harm girls in the scheduling of their seasons. *See Pederson v. Louisiana State University*, 213 F.3d 858 (5th Cir.2000). In that case, it was clear that Louisiana State University (LSU) was providing unequal athletic opportunities for its female students, for example, by only sponsoring new sports for

---

regulations promulgated under Title IX: equal treatment claims, which this case presents, or effective accommodation claims. *Boucher v. Syracuse Univ.*, 164 F.3d 113, 115 n. 1 (2d Cir.1999) (*cited in Pederson v. Louisiana State Univ.*, 213 F.3d 858, 865 n. 4 (5th Cir.2000)). Equal treatment claims derive from Title IX regulations calling for equal provision of athletic benefits and opportunities among the sexes. *Boucher*, 164 F.3d at 115 n. 2 (*cited in Pederson*, 213 F.3d at 865 n. 4).

The MHSAA agrees that Title IX assesses the athletic program of a liable party, but it also argues that Title IX does not assess the impact that "outside, business interests," like amateur athletic clubs and colleges and universities, have on these programs. That twists the issue. If discriminatory operation of the state's athletic programs through placement of seasons "denie[s] [girls] the benefits of, or … subject[s] [girls] to discrimination" in interscholastic athletics such that girls' amateur and collegiate opportunities are limited in a way that boys' opportunities are not, Title IX is implicated.

women that administrators considered "more feminine" sports or by refusing to sponsor fast-pitch softball because "the women might get hurt." *Pederson*, 213 F.3d at 881. The federal district court there found that LSU was violating Title IX, but for the purposes of deciding whether monetary relief was due to Plaintiffs in addition to injunctive relief, the district court determined that the discrimination was unintentional and thus Plaintiffs could not obtain monetary relief. *Pederson*, 912 F.Supp. 892, 917 (M.D.La. 1996). The district court still ordered injunctive relief, however, on the basis of the Title IX violation. *Id.* at 921. That is the only kind of relief requested in this lawsuit.

After reviewing the facts, the Fifth Circuit reversed the district court's finding that the LSU discrimination was unintentional, held that LSU was intentionally discriminating between women and men, and held that the district court erroneously dismissed the monetary damages claims. *Pederson*, 213 F.3d at 884. But in determining whether an "effective accommodation" violation of Title IX was present, which is unlike the "equal treatment" violation alleged here, the Fifth Circuit affirmed the district court's finding that LSU was not effectively accommodating the sports interests of its female students. *Id.* at 879.

*Pederson* held that regulations promulgated under Title IX guide a court's analysis as to whether a violation has occurred. *Pederson*, 213 F.3d at 879. This is the analysis that this Court has articulated: in an "equal treatment" violation under Title IX, the question is whether female high school athletes are denied the benefits of school athletic programs as a result of the scheduling system of Defendant MHSAA that they would otherwise enjoy if they were male.

In the Findings of Fact, the Court found that all of the girls' sports at issue where a counterpart boys' team exists are subject to disadvantages to which they would not otherwise be subject if they played in the seasons that the boys do. Moreover, the Court found that girls who play volleyball in the non-traditional season in which it is now scheduled suffer disadvantages that they would not otherwise suffer if they were male and participated in a boys-only sport that was scheduled in its traditional season. As a result, this Court comes to the conclusion that Defendant MHSAA violated and continues to violate Title IX by scheduling seasons of the sports at issue in the manner in which it has.

## III. PLAINTIFFS' ELLIOTT–LARSEN CIVIL RIGHTS ACT CLAIM

There are two provisions of the Elliott–Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101, *et seq.*, Michigan's civil rights statute, at issue in this litigation. One applies to the acts of "educational institutions." The other applies to discrimination in the provision of public accommodation and/or public services. Under the ELCRA provision prohibiting discrimination in Michigan in the provision of a public service or public accommodation, this Court finds that Defendant MHSAA violated Plaintiffs' rights under the ELCRA.

### A. Mich. Comp. Laws § 37.2402

First, "educational institutions" are prohibited from discriminating against individuals in their benefit from the institution, or services, activities, or programs provided by the institution, on the basis of an individual's sex. Mich. Comp. Laws § 37.2402 (2001). The definition of "educational institutions" includes "an agent of an educational institution." Mich. Comp. Laws § 37.2401 (2001). Therefore, if De-

fendant qualifies as an agent of the schools that comprise its membership, Defendant is subject to the ELCRA under this provision of the ELCRA.

"Agent" is not defined in the ELCRA. This Court's research turned up no Michigan cases, nor any federal cases interpreting Michigan law, defining what an "agent" of an "educational institution" is for purposes of the ELCRA. Under Michigan law generally, in determining "[w]hether an agency has been created," a court is to consider "the relations of the parties as they in fact exist under their agreements or acts." *St. Clair Intermed. Sch. Dist. v. Intermediate Educ. Ass'n/Michigan Educ. Ass'n*, 458 Mich. 540, 557, 581 N.W.2d 707 (1998) (quoting *Saums v. Parfet*, 270 Mich. 165, 170–171, 258 N.W. 235 (1935)). The Michigan Supreme Court has noted that in its broadest sense agency "includes every relation in which one person acts for or represents another by his authority." *Id.* An agent is a business representative whose function it is to bring about, modify, affect, accept performance of, or terminate contractual obligations between the agent's principal and third persons. *Id.* at 557–58, 581 N.W.2d 707. Also fundamental to the existence of an agency relationship is the right to control the conduct of the agent with respect to the matters entrusted to the agent. *Id.* at 558, 581 N.W.2d 707 (citations omitted).

■ The Court finds that the MHSAA cannot be liable to ELCRA claims under this section because it cannot be considered its member schools' agent. The Michigan Supreme Court has said that it is "fundamental" to finding that one party in a relationship is an agent that the principal be able to control the conduct of the agent with respect to the matters entrusted to the agent. One member school alone cannot control the actions of the MHSAA, so

the MHSAA is not the "agent" of any one member school.

Moreover, the member schools together cannot be considered a "principal" because they cannot together be one "educational institution" under the statute, as they in fact constitute many educational institutions. Additionally, the member schools have come together in the form of the MHSAA largely to make contracts among themselves, regarding eligibility rules, etc., which is an associational relationship, but not an agency.

### B. Mich. Comp. Laws § 37.2302

■ The ELCRA also covers those entities providing public accommodation or public services. "Except where permitted by law, a person shall not: (a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public services because of ... sex...." Mich. Comp. Laws § 37.2302 (2001).

A "person" is defined as "an individual, agent, association, corporation, ... unincorporated association, the state or a political subdivision of the state, or any agency of the state, or any other legal or commercial entity." Mich. Comp. Laws § 37.2103(g) (2001). Surely, Defendant MHSAA is a "person" for these purposes since it has incorporated itself with the State of Michigan. (Tr. Exh. 28 (MHSAA Articles of Incorporation).) It could also aptly be described as an "association" given its structure, and while it is not dispositive, the fact that the word "association" also appears in its name lends support to this conclusion.

In addition, this Court finds that the MHSAA provides both a "public service" and a "public accommodation." A "public service" includes "a tax exempt private agency established to provide a service to

the public." Mich. Comp. Laws § 37.2301(b) (2001). Lions clubs were held liable under this section of the ELCRA and found to be both providing a "public service" and constituting a "public accommodation." *Rogers v. International Ass'n of Lions Clubs,* 636 F.Supp. 1476, 1479 (E.D.Mich.1986). The Court held that Lions clubs provided a "public service" because the volunteer efforts by its members were made available to the public. *Id.* The Court also found it important that the Lions were tax exempt. *Id.* To some degree that the Court could not fully determine, the MHSAA is also tax exempt. (*See* Tr. Exh. 36 (copies of MHSAA tax returns)). It certainly was established to provide a service to the public, the organization of interscholastic athletics in the state's schools, and it is still in existence for that purpose. Thus, the MHSAA qualifies as a "public service." [57]

The MHSAA qualifies as providing a "public accommodation" as well. An event open to the public held in a public place is a place of "public accommodation." *Rogers,* 636 F.Supp. at 1479. For one, the MHSAA sponsors championship tournament events, held in public places and open to members of the general public. Additionally, the MHSAA facilitates the scheduling of interscholastic athletics generally with its activities, and athletic programs hold competitions in public places that are open to the general public on a regular basis. Similarly, the Michigan Supreme Court found that a township's athletic program offered to elementary school children is a "public accommodation" or

"public service" under the ELCRA. *Cf. Department of Civil Rights ex rel. Forton v. Waterford Twp. Dep't of Parks and Rec.,* 425 Mich. 173, 202, 387 N.W.2d 821 (1986) (*Forton* ) (apparently assuming that the program at issue qualified under Mich. Comp. Laws § 37.2302 and remanding for retrial and for application of the constitutional standard enunciated in the opinion).

The Michigan Supreme Court determined that the goal of the Michigan Legislature in adopting this provision of the ELCRA was to broaden the scope of those parties to whom civil rights legislation would apply in the State of Michigan, in contrast to comparable federal provisions. *Forton,* 425 Mich. at 188–89, 387 N.W.2d 821. Most notably, the ELCRA covers non-governmental conduct in the handling of public accommodations and services that federal provisions do not. *Id.* at 186, 387 N.W.2d 821.

## C. Standard to Find Discrimination Under Mich. Comp. Laws § 37.2302

But the Michigan Supreme Court held that the goal of ELCRA was not to broaden the standard of equal protection, i.e., not to require stricter scrutiny of laws that classify on the basis of protected characteristics than federal law would, but instead to provide the same level of scrutiny of discriminatory classifications. *Forton,* 425 Mich. at 188–89, 387 N.W.2d 821. *Forton,* which also involved a claim strikingly similar to this case, involved a challenge to a township's practice of assigning different seasonal schedules to township league teams for elementary school stu-

---

**57.** Moreover, a "public service" also encompasses "a public facility, department, agency, board, or commission owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof . . . ." Mich. Comp. Laws § 37.2301(b) (2001). It is likely that the MHSAA could also qualify under this definition as well, since the political

subdivisions for whom it acts as an agency or commission to control interscholastic athletics are local school boards and schools. These local school boards would otherwise have responsibility for organizing interscholastic athletics or would have to find another vehicle beside the MHSAA to do so. *See* Findings of Fact on Defendant MHSAA.

860

dents on the basis of sex in its township athletic program. *Forton,* 425 Mich. at 190, 387 N.W.2d 821. The Michigan Supreme Court held that the applicable standard to determine whether unlawful discrimination has occurred because of a discriminatory classification is the same standard used under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. *Forton,* 425 Mich. at 190, 387 N.W.2d 821 (apply-ing to "public accommodation" claims). *See also Alspaugh v. Comm'n on Law Enforcement Standards,* 246 Mich.App. 547, 555–56, 634 N.W.2d 161 (2001) (using intermediate scrutiny in ELCRA challenge by males to state police's different passing standards for males and females); *Garrett v. Board of Educ. of Sch. Dist. of City of Detroit,* 775 F.Supp. 1004, 1010 (E.D.Mich.1991) (citing *Forton,* 425 Mich. at 190, 387 N.W.2d 821).[58]

**58.** *Garrett* involved a challenge by girls and their parents to the establishment of all-male public school academies in Detroit. *Garrett,* 775 F.Supp. at 1005. Like the instant case, *Garrett* presented an intentional discrimination claim because the school system had a rule that on its face differentiated between males and females, i.e., female children were not permitted to attend an all-male, public academy. *See id.* at 1006 (proceeding to consider whether the claim serves "important governmental objectives" and that the discriminatory classification involved was "substantially related to the achievement of those objectives" because of the rule treating girls and boys differently in admission).

Another federal court in Michigan has stated that plaintiffs bringing an ELCRA claim under *either* an intentional discrimination or disparate impact theory must produce facts from which the finder of fact could reasonably infer unlawful motivation. *Sanders v. Southwest Airlines Co.,* 86 F.Supp.2d 739, 744 (E.D.Mich.2000). This Court respectfully finds that to be an erroneous interpretation of Michigan law.

The Michigan Supreme Court is the highest authority on the meaning of Michigan law. As explained in this opinion, the Michigan Supreme Court has held that ELCRA claims are evaluated under the same standards as federal Equal Protection claims are. *Forton,* 425 Mich. at 190, 387 N.W.2d 821. Under federal law, an intentional discrimination claim does not require proof of discriminatory motivation because the challenged law or rule has already discriminated against a protected class on its face. *Cf. Virginia,* 518 U.S. at 532–34, 116 S.Ct. 2264 (compare *Washington v. Davis,* 426 U.S. at 241–242, 96 S.Ct. 2040). *Forton,* as an intentional discrimination case, employed the intermediate scrutiny standard for sex-based classifications that the U.S. Supreme Court still employs.

*Sanders* cites cases from the Michigan Court of Appeals for its proposition requiring discriminatory motivation in cases presenting a facial classification. *See Reisman v. Regents of Wayne State Univ.,* 188 Mich.App. 526, 538, 470 N.W.2d 678 (1991); *Meagher v. Wayne State Univ.,* 222 Mich.App. 700, 708–09, 565 N.W.2d 401 (1997); *Fonseca v. Michigan State Univ.,* 214 Mich.App. 28, 31, 542 N.W.2d 273 (1995) (*cited in Sanders,* 86 F.Supp.2d at 744). But cases to which *Sanders* cites are all disparate impact cases, so those type of cases *do* require proof of discriminatory motivation in addition to proof that a member or members of a protected class have been disparately impacted by a law, rule or decision otherwise neutral on its face. In turn, these Michigan Court of Appeals cases all cite to other disparate impact cases, all employment discrimination cases with the exception of *Fonseca,* containing a summary statement with the proposition that both intentional discrimination and disparate impact claims require proof of discriminatory motivation behind the decision, but none of them cite *Forton.* After *Forton,* that proposition was implicitly rejected by the Michigan Supreme Court. *Cf. Forton,* 425 Mich. at 190, 387 N.W.2d 821.

For citation history of *Reisman, see Singal v. General Motors Corp.,* 179 Mich.App. 497, 502–03, 447 N.W.2d 152 (1989) (*cited in Reisman,* 188 Mich.App. at 538, 470 N.W.2d 678); *Dixon v. WW Grainger, Inc.,* 168 Mich.App. 107, 114, 423 N.W.2d 580 (1987) (*cited in Singal,* 179 Mich.App. at 503, 447 N.W.2d 152); *Jenkins v. Southeastern Michigan Chapter, Amer. Red Cross,* 141 Mich.App. 785, 793–94, 369 N.W.2d 223 (1985) (*cited in Dixon,* 168 Mich.App. at 114, 423 N.W.2d 580); *Michigan Civil Rights Comm'n ex rel. Boyd v. Chrysler Corp.,* 80 Mich.App. 368, 373 n. 3,

Thus, the standard for decision under Plaintiffs' ELCRA claim is the same as under their Fourteenth Amendment claim. As stated in the above discussion of why Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment have been violated, the Court similarly finds that Defendant MHSAA has violated the ELCRA.

## CONCLUSION

**"Parents, athletes and spectators should insist on equality for women's athletics. It's nothing less than the law, and nothing less than women athletes deserve."** -Editorial, *You Go, Girls,* St. Louis Post–Dispatch, July 13, 1999, at B16.

Unfortunately, the insistence required in this case took the form of legal action. The history of girls' sports lends a belief that girls' seasons were originally put in the seasons that they were for impermissible reasons, and they simply have not been moved because of inertia or out of concern for the inconveniences that boys' programs would face. Continued administrative convenience of being able to find facilities, coaches or officials more easily if girls and boys are in separate seasons also does not justify such a system where the separate seasons are not equal for girls. If lack of resources is indeed a reality that requires single-sex seasons in some sports, which was not proved to the Court's satisfaction, then that is a reality that boys must also share.

The MHSAA has provided examples to this Court where it has been pro-active in promoting gender equity in sports. While the Court applauds the MHSAA on these efforts, the fact that the MHSAA may have been or continues to be pro-active in promoting gender equity in some areas of interscholastic sports in Michigan is not relevant to the fact that the MHSAA has acted contrary to law requiring gender equity in the particular situation before this Court. Frankly, conducting an unbiased examination of the facts and listening to dissenters, instead of merely surveying,

263 N.W.2d 376 (1977) (*cited in Jenkins,* 141 Mich.App. at 794, 369 N.W.2d 223) (discussing the pleading requirements for a disparate treatment, employment discrimination case).

*For citation history of Meagher, see Reisman,* 188 Mich.App. at 538–39, 470 N.W.2d 678 (*cited in Meagher,* 222 Mich.App. 708–09, 565 N.W.2d 401); *Lytle v. Malady,* 209 Mich. App. 179, 185 n. 1, 530 N.W.2d 135 (finding, without citation, that intentional discrimination and disparate impact are the same theory) (*cited in Meagher,* 222 Mich.App. at 709, 565 N.W.2d 401) (*Lytle* rev'd on other grounds, 456 Mich. 1, 566 N.W.2d 582 (1997)) (partially vacated on other grounds, 458 Mich. 153, 579 N.W.2d 906 (1998)); *Brewster v. Martin Marietta Aluminum Sales, Inc.,* 145 Mich.App. 641, 654, 378 N.W.2d 558 (1985) (*cited in Meagher,* 222 Mich.App. at 709, 565 N.W.2d 401); *Boyd,* 80 Mich.App. at 373 n. 3, 263 N.W.2d 376 (*cited in Brewster,* 145 Mich.App. at 654, 378 N.W.2d 558; *Schipani,* 102 Mich.App. at 617, 302 N.W.2d 307); *Jenkins,* 141 Mich.App. 785, 369

N.W.2d 223 (*cited in Brewster,* 145 Mich.App. at 654, 378 N.W.2d 558); *Schipani v. Ford Motor Co.,* 102 Mich.App. 606, 617, 302 N.W.2d 307 (1981) (*cited in Brewster,* 145 Mich.App. at 654, 378 N.W.2d 558) (*Schipani* recognized by *Kostello v. Rockwell Intern. Corp.,* 189 Mich.App. 241, 245, 472 N.W.2d 71 (1991) as routinely rejected by other panels on other grounds).

*Fonseca* was a claim by a student not accepted to an MSU graduate program that her rejection was for discriminatory reasons, similar to employment discrimination cases where an individual is fired or denied promotion for allegedly discriminatory reasons. *Fonseca,* 214 Mich.App. at 29, 542 N.W.2d 273. In *Fonseca,* the Court of Appeals made no statements with respect to claims proven through intentional discrimination shown through a rule or classification discriminatory on its face, but only concerned decisions allegedly made for discriminatory reasons, which must be proved to state a disparate impact claim. *See id.* at 31, 542 N.W.2d 273.

would have told the MHSAA a long time ago what this Court is now telling it.

The Court will declare that the MHSAA's current scheduling of high school girls' sports in Michigan violates the Equal Protection Clause of the Fourteenth Amendment, Title IX, and Michigan's Elliott–Larsen Civil Rights Act. The Court will enjoin Defendant MHSAA from continuing its current scheduling of interscholastic athletics seasons in Michigan. As a result, the Court will retain jurisdiction over this case to order that an appropriate remedy be adopted in a Compliance Plan to be submitted by Defendant MHSAA.

The Court will order that Defendant MHSAA bring its scheduling of the seasons of high school sports into compliance with the law by the 2003–2004 school year. Defendant MHSAA will be ordered to submit a Compliance Plan consistent with this Opinion by June 24, 2002, detailing a new schedule for sports seasons that complies with the law.

The parties are reminded that Defendant MHSAA may design the new schedule in a number of different ways, and as long as girls and boys share the advantages and disadvantages of the new seasons equitably, this Court will approve the Compliance Plan. For example, Defendant MHSAA is not required to combine seasons of girls' teams and boys' teams in any particular sport, but any remaining single-sex seasons must as a group advantage and disadvantage girls and boys equally. In addition, nothing prevents Defendant MHSAA from utilizing various other scheduling mechanisms designed to treat males and females alike, such as putting freshman and/or junior varsity teams of both sexes into the disadvantageous season while putting varsity teams of both sexes into the advantageous season.

After Defendant MHSAA submits its Compliance Plan proposing how it will re-schedule interscholastic sports seasons to comply with applicable law, Plaintiffs and the United States will be given the opportunity to respond to the MHSAA's proposed Compliance Plan. Plaintiffs and the United States will be ordered to respond to Defendant MHSAA's Compliance Plan by July 15, 2002 or within fourteen days of service of the plan on Plaintiffs and the United States, whichever is earlier.

At that time, the Court will decide whether the Compliance Plan of new seasons scheduling complies with the applicable law and is an appropriate remedy. The Court will also order briefing from the parties on the issue of whether Plaintiffs are entitled, under 42 U.S.C. § 1988, to payment of their attorneys' fees by Defendant MHSAA and the appropriate amount. Finally, the Court will approve the partial settlement reached by Plaintiffs and Defendant MHSAA on other issues originally part of this litigation and will enter the Consent Decree at the same time as this Opinion.